[No. 31783-4-II.   Division Two.   August 8, 2006.]

JAMES E. HUNGERFORD, *as Personal Representative*, ET AL., *Appellants*, v. THE DEPARTMENT OF CORRECTIONS, *Respondent*.

242

244

*John R. Walicki* (of *Law Office of John R. Walicki*), and *Michael T. Schein* (of *Michael T. Schein, Attorney*), for appellants.

*Robert M. McKenna, Attorney General,* and *Glen A. Anderson, Assistant,* for respondent.

¶1 BRIDGEWATER, J. — Cecil Davis, a convicted felon/ misdemeanant, murdered Jane Hungerford-Trapp while the Department of Corrections (DOC) was supervising Davis's legal financial obligations (LFO). James Hungerford, personal representative of Jane Hungerford-Trapp's estate, appeals from a summary judgment that ended the estate's wrongful death suit against DOC.

¶2 We hold that summary judgment was appropriate regarding DOC's negligence because Hungerford failed to establish a genuine issue of material fact as to whether DOC's alleged negligence proximately caused Hungerford-Trapp's death. Hungerford speculates that Davis would have been in custody on the day of the murder, April 14, 1996, but for DOC's failures to report Davis's probation violations on June 5, 1995. He theorizes that because the trial court could have imposed Davis's suspended misdemeanor sentence and imposed 60-day sanctions for his failure to report, DOC is liable for his sister's death. This speculation is baseless. The failures to report violations were for Davis's misdemeanor; thus, 60-day sanctions could not have been imposed. The court was aware on June 5, 1995, that Davis had failed to appear in court to explain his failure to pay the misdemeanor LFO but ended his direct probation supervision anyway; thus, the trial court's independent action broke the causal chain between DOC's actions and Hungerford-Trapp's murder. Moreover, assuming the court had revoked Davis's suspended misdemeanor sentence, Hungerford cannot prove that Davis would have been in jail on the date of his sister's murder.

¶3 We also reaffirm our holding in *Couch v. Department of Corrections*, 113 Wn. App. 556, 571, 54 P.3d 197 (2002), *review denied*, 149 Wn.2d 1012 (2003), that DOC had no duty to prevent Davis from committing violent crimes after June 5, 1995. As we held in *Couch*, the duty of care in the felony matter ended in 1992, when Davis was placed on felony LFO status. Thus, after 1992, there was no "take charge" relationship under his felony probation, and DOC owed no duty to potential future victims with regard to the limited felony LFO supervision. *Couch*, 113 Wn. App. at 571.

¶4 The duty of care in the misdemeanor similarly ended on June 5, 1995, when Davis was placed on continued LFO status. Here, the murder occurred in April 1996, when DOC did not have a "take charge" relationship; thus, there was no duty from which liability flows. We do not address the State's cross-appeal because we affirm on other grounds.

## FACTS

¶5 On April 14, 1996, Jane Hungerford-Trapp was murdered in the Hilltop area of Tacoma. The police kept Hungerford-Trapp's brother, James Hungerford, informed of developments in the case. For nine months, from April 14, 1996 to January 25, 1997, the police identified three possible suspects: James Heard, Mr. Heard's girl friend, and Jim Hoyle.

¶6 In late January 1997, the police investigating the murder of another woman, Yoshiko Couch, discovered that Davis had bragged that he had murdered a white woman in the same place that the police found Hungerford-Trapp's body. On February 6, 1997, although Davis denied involvement, the police told James Hungerford that Davis was a suspect.

¶7 Police searched Davis's residence and discovered a pair of boots. They seized the boots to compare them to boot prints at Hungerford-Trapp's murder scene and to test them for blood evidence. On April 23, 1998, the Washington

State Patrol crime laboratory reported that blood found on the boots was consistent with Hungerford-Trapp's DNA (deoxyribonucleic acid). According to James Hungerford, after the blood test, the police told him that they were moving forward with the case and that Davis was the prime suspect. In November 1998, the prosecutor decided not to file charges against Davis for the murder of Hungerford-Trapp because Davis had already been convicted and sentenced to death for murdering Yoshiko Couch.

¶8 In October 1999, Couch's estate sued DOC, alleging that DOC failed to adequately supervise Davis. *Couch*, 113 Wn. App. at 563. In November 2000, a jury returned a $15 million verdict against DOC. Clerk's Papers (CP) at 63; *Couch*, 113 Wn. App. at 563. Hungerford, who is an attorney, read about the jury verdict in the newspaper and learned about Davis's criminal history. As representative of Hungerford-Trapp's estate, he filed the wrongful death claim against DOC on February 5, 2001.

¶9 Hungerford relies on the facts established in *Couch*, which we briefly recount here.[1] In 1990, Davis was convicted of felony assault and put under a felony LFO to pay fines, costs, and restitution. In July 1992, Davis finished his sentence and his probation for the assault but had not yet paid his felony LFO.

¶10 On December 21, 1992, Davis pleaded guilty to a third degree theft, a gross misdemeanor. The court sentenced him to not more than one year in jail and suspended the sentence on the condition that he complete two years of probation. The court also imposed a misdemeanor LFO to pay restitution and court costs.

¶11 One year later, in November and December 1993, Davis attracted law enforcement attention. He was a suspect in the murder of a woman, G.A., killed in November 1993. And on December 26, 2003, he was arrested for the assault and rape of another woman, T.H. He was held in jail

---

[1] We take the following facts from our opinion in *Couch*, 113 Wn. App. at 559-61.

for 13 months awaiting trial before being released as the result of a DNA test.

¶12 On February 8, 1995, two days after his release, DOC reported that Davis had failed to make payments on his misdemeanor LFO. After Davis failed to appear to explain his failure to pay, the superior court issued an arrest warrant.

¶13 On June 4, 1995, Davis was arrested for a domestic violence assault for which he was later found not guilty. The police also arrested Davis on the outstanding warrant for his failure to pay the misdemeanor LFO, and the trial court had a hearing the next day, on June 5, 1995. The court found that Davis's failure to pay was not willful, and the prosecutor, the trial court, and Davis agreed to extend probation for LFO monitoring only. The court also specifically ordered Davis released on the misdemeanor, meaning that his direct supervised probation was finished even though his LFO supervision continued.

¶14 Hungerford alleges that DOC failed to report Davis's probation violations at the June 5, 1995, hearing. But Hungerford included no record of the June 5, 1995, hearing and did not provide any evidence of what facts the trial court did or did not consider on June 5, 1995. The only evidence Hungerford presents is William Stough's declaration that asserts that Davis's probation file included 24 to 26 failures to report. Stough's declaration does not indicate when these failures to report took place or whether they were under the misdemeanor cause number or the felony cause number. In short, this record contains insufficient evidence for us to determine what happened at the June 5, 1995, hearing.

¶15 In any case, in December 1995, Davis failed to appear at a scheduled misdemeanor LFO review hearing, and the court issued a bench warrant for his arrest. *Couch*, 113 Wn. App. at 561. And on February 13, 1996, the State obtained an arrest warrant for failure to pay the still pending felony LFO.

¶16 On April 14, 1996, Hungerford-Trapp was murdered. Six days later, Davis was arrested on his outstanding warrants. On April 26, 1996, the trial court terminated his LFO misdemeanor supervision, imposed his suspended misdemeanor sentence, continued the felony LFO supervision, and concurrently sentenced him to 60 days as a sanction for failing to pay the felony LFO. With good time, Davis served only 213 days of his misdemeanor sentence.[2]

¶17 On the basis of these facts, Hungerford filed a wrongful death suit against DOC. After filing the case against DOC for Hungerford-Trapp's death, Hungerford agreed to stay the proceedings pending the resolution of DOC's appeal in *Couch*. After we issued our opinion holding that DOC did not have a duty to control Davis's behavior after June 5, 1995, and the Washington Supreme Court denied the petition for review, DOC moved for summary judgment on Hungerford's case.

¶18 DOC argued that the statute of limitations barred the suit, that DOC owed no duty to control Davis, and that Hungerford could not prove proximate cause. DOC also argued that the trial court should strike portions of Hungerford's declarations in opposition to summary judgment. The trial court denied the motions to strike but granted summary judgment against Hungerford on three grounds: (1) the statute of limitations began in late February 1997 and expired in February 2000; (2) DOC's duty to supervise ended before Hungerford-Trapp's murder; and (3) reasonable minds could conclude only that even had the trial court revoked Davis's probation on June 5, 1995, he would have been released in time to murder Hungerford-Trapp.

¶19 Hungerford appeals the trial court's summary judgment order. DOC cross-appeals the trial court's denial of its motion to strike.

---

[2] The exact time Davis served depends on whether the court credited him for time served between his arrest and suspension hearing. We assume that he was, but it makes no difference to our analysis.

## ANALYSIS

¶20 The parties focus their attention on the issues of proximate cause and duty. Hungerford argues that the trial court erred in granting summary judgment on the issues of whether DOC had a duty to prevent his sister's murder and whether there was a genuine issue of material fact as to whether DOC's actions proximately caused Hungerford-Trapp's death. The State asks us to affirm the trial court's finding that DOC did not have a duty to prevent the April 14, 1996, murder and that DOC's actions were not the proximate cause of Davis's actions.

■ ■ ¶21 We review a trial court's decision to grant summary judgment de novo. *Hertog v. City of Seattle*, 138 Wn.2d 265, 275, 979 P.2d 400 (1999). Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c); *Hertog*, 138 Wn.2d at 275. We consider all facts in the light most favorable to the nonmoving party. *Vallandigham v. Clover Park Sch. Dist. No. 400*, 154 Wn.2d 16, 26, 109 P.3d 805 (2005). But we do not weigh evidence or resolve factual disputes. *Babcock v. State*, 116 Wn.2d 596, 598-99, 809 P.2d 143 (1991).

■ ■ ¶22 The parties bear different burdens in the context of a summary judgment motion. The moving party bears the burden of showing that there is no genuine issue of material fact. *Atherton Condo. Apartment-Owners Ass'n Bd. of Dirs. v. Blume Dev. Co.*, 115 Wn.2d 506, 516, 799 P.2d 250 (1990). If the moving party meets its burden, the nonmoving party must present evidence to establish a material factual dispute. *Atherton*, 115 Wn.2d at 516. The nonmoving party may not rely on speculation or argumentative assertions that factual issues remain. *White v. State*, 131 Wn.2d 1, 9, 929 P.2d 396 (1997).

## I. Proximate Cause

¶23 Although, analytically, the question of duty comes first, we turn first to proximate cause because the parties

briefed and argued the issues here under that framework. We will also address duty later.

¶24 Hungerford presents two theories of proximate cause. First, he argues that had DOC reported Davis's probation violations, the trial court would have revoked Davis's probation on June 5, 1995, and reimposed Davis's misdemeanor sentence of 317 days. Because Hungerford-Trapp was murdered 314 days after June 5, 1995, he argues that DOC's failure to report the probation violation caused her death. Alternatively, he argues that had DOC properly supervised Davis, Davis would have been rehabilitated and would not have committed the murder.

¶25 Proximate cause consists of two elements: cause in fact and legal causation. *Tyner v. Dep't of Soc. & Health Servs.*, 141 Wn.2d 68, 82, 1 P.3d 1148 (2000). Cause in fact is the actual " 'but for' " cause of the injury. *Tyner*, 141 Wn.2d at 82 (quoting *Schooley v. Pinch's Deli Mkt., Inc.*, 134 Wn.2d 468, 478, 951 P.2d 749 (1998)). Legal causation is grounded in policy determinations and focuses on whether, as a matter of policy, the connection between the ultimate result and act of the defendant is too remote to establish liability. *Tyner*, 141 Wn.2d at 82. The same policy considerations are relevant to our determination of duty, but the existence of duty does not automatically satisfy the requirement of legal causation. *Hertog*, 138 Wn.2d at 284.

¶26 Turning to the first element, to prove cause in fact, Hungerford must show that there was a direct, unbroken sequence of events linking the actions of the defendant to the plaintiff. *Joyce v. Dep't of Corr.*, 155 Wn.2d 306, 322, 119 P.3d 825 (2005). Cause in fact is an issue for the jury and is a matter of law only when reasonable minds can come to only one conclusion. *Joyce*, 155 Wn.2d at 322.

¶27 When the plaintiff's claim arises in a situation where a trial court takes action and did so with all of the material evidence, the causal chain is severed as a matter of law. *Tyner*, 141 Wn.2d at 86 (citing *Hertog*, 138 Wn.2d at 284). Summary judgment would still be inappro-

priate if we can infer from other facts in the record that the trial court did not have all the material facts. But if there is no evidence in the record, we cannot draw an inference in favor of Hungerford. And to resist a summary judgment motion, Hungerford may not rest on speculation or argumentative assertions that factual issues remain. *White*, 131 Wn.2d at 9.

¶28 Here, at the June 1995 hearing, the trial court made the decision to end Davis's active supervision and impose LFO monitoring only. Even if DOC agreed with the trial court's decision, the trial court's action broke the causal chain if the trial court had all relevant material information. *Tyner*, 141 Wn.2d at 86. There is no evidence in the record about what the trial court knew or did not know in making its June 5, 1995, decision. But we do know that the court issued a warrant for Davis's failure to appear for a hearing to explain why he had not paid his misdemeanor LFO, so the court was already aware Davis had violated his probation conditions. And the trial court still ended active supervision. Without something in the record to show that the trial court did not have all relevant facts, the court's June 1995 action was an intervening act under *Joyce*, 155 Wn.2d at 322.

¶29 And Hungerford presents no evidence in this record that the trial court was not aware of Davis's probation violations. The only evidence of DOC's alleged breach Hungerford presents is William Stough's declaration, in which Stough indicates he discovered 24 to 26 instances in which Davis missed reporting dates. According to the declaration, these reports appeared in Davis's "file." CP at 179. But there is no indication in Stough's declaration as to what the trial court learned at the June 5, 1995, hearing or whether the trial court had access to Davis's file. Stough merely concludes that if DOC had fully reported Davis's violations, the court, more probably than not, would have revoked his probation.

¶30 But Stough's assertion is not backed by any evidence of what the trial court knew in making its decision. In a

similar case, Division One determined that Stough's opinion as to what a court would or would not do is inadmissible opinion evidence. *Estate of Bordon v. Dep't of Corr.*, 122 Wn. App. 227, 247, 95 P.3d 764 (2004), *review denied*, 154 Wn.2d 1003 (2005). The court noted that Stough had never been a judge and any opinion he might issue was purely speculative. *Bordon*, 122 Wn. App. at 247. We agree and hold that in this case, Stough's unsupported assertion that a court would have revoked probation had it known of Davis's probation violations is not sufficient to defeat summary judgment. Hungerford needed to present evidence about what happened at the June 5, 1995, hearing.

¶31 Even if Hungerford could produce evidence that the trial court was not aware of Davis's propensity for failing to report to his probation officer and that the trial court would have imposed Davis's suspended sentence but for DOC's alleged negligence, he presents no evidence that Davis would have been in jail on the day of Hungerford-Trapp's murder had DOC acted differently. He relies on observing that Davis's suspended sentence for the misdemeanor was 317 days and the murder was 314 days after the trial court ended Davis's active supervision. Facially, this appears to support Hungerford's argument.

¶32 But Davis was eligible for good time credit, as evidenced by the fact that he only served 213 days of his 317 day sentence when it was finally revoked six days after the murder. RCW 9.94A.728. And Davis has a liberty interest in good time credit. *In re Pers. Restraint of Gronquist*, 138 Wn.2d 388, 397, 978 P.2d 1083, *cert. denied*, 528 U.S. 1009 (1999). Accordingly, he is entitled to minimal due process before the State could take it away. *Gronquist*, 138 Wn.2d at 396-97. Because Davis has a liberty interest in good time, we must presume, absent proof that he would have lost his good time credit, that he would have received good time credit. Thus, even had the trial court revoked probation and imposed the full sentence on June 5, 1995, Davis still would have been released in time to commit the murder. By failing to introduce evidence that Davis would have lost good time,

Hungerford failed to meet his burden. Thus, on this record, DOC's negligence was not a but-for cause of Hungerford-Trapp's death because even had the trial court imposed Davis's misdemeanor sentence, Davis would have been released in time to kill Hungerford-Trapp.

¶33 Hungerford attempts to avoid this conclusion by asserting that Davis would have committed another crime before Hungerford-Trapp's death and thus been in custody on the date she was killed because after his probation was revoked on April 20, 1996, and he served the full sentence, he was arrested for committing another crime. Hungerford suggests that based on Davis's pattern of crime, a trier of fact could infer he inevitably would have committed a crime after his release from the imposition of his misdemeanor sentence. But this is rank speculation, and speculation and argumentative assertions are not sufficient to create a genuine issue of material fact. *White*, 131 Wn.2d at 9. Davis may or may not have committed another crime had he been forced to serve his theft sentence in June 1995; Hungerford's counter-factual world is too speculative to support a lawsuit.

¶34 Hungerford next argues that the trial court could have imposed 60-day sanctions and that these sanctions would have kept Davis in jail beyond the day his sister was murdered. But these 60-day sanctions are for felony violations under former RCW 9.94A.200(2)(b) (1994),[3] not for misdemeanors. The June 5, 1995, probation hearing at issue concerned Davis's misdemeanor theft probation. Accordingly, the only relevant probation violations would be for the misdemeanor. Because the 60-day sanctions are available only for felony violations, the trial court could not have imposed a 60-day sanction for probation violations at the June 5, 1995, hearing.

---

[3] Former RCW 9.94A.200(2)(b) (1994) is currently codified at RCW 9.94A.634(3)(c) and states: "[If an offender fails to comply with any of the requirements or conditions of a sentence, the court] may order the offender to be confined for a period not to exceed sixty days for each violation." For the purposes of chapter 9.94A RCW, "offender" is defined as "a person who has committed a felony as established by state law." Former RCW 9.94A.030(23) (1994), currently codified at RCW 9.94A.030(31).

¶35 We reach the same result under the second element: legal causation. Hungerford argues that the trial court could have imposed 60-day sanctions for Davis's failure to pay his felony LFO. But that was true in *Couch*. And we held that despite the trial court's ability to impose 60-day sanctions, DOC had no duty to do so to prevent future crimes. *Couch*, 113 Wn. App. at 569. The same reasoning applies here for the purposes of proximate cause. The failure to seek a 60-day sanction is not an event for which DOC can be liable in tort. As a matter of legal causation, we hold that Davis's future crimes were too remote for DOC's actions to be a proximate cause of Hungerford-Trapp's murder.

¶36 Last, Hungerford suggests that he could prove proximate cause on the theory that had DOC properly supervised Davis during his probation, Davis would have been rehabilitated. Hungerford relies on William Stough's assertion that the failure to supervise Davis was a "direct cause of Davis'[s] recidivism." CP at 179. Stough reasons that "[e]xperience and studies have shown that recidivism rate for closely supervised releasees is much less than for those who learn that their supervision is lax or sporadic." CP at 180. Hungerford asserts that Stough's declaration creates a genuine issue of material fact as to whether the failure to supervise was the cause of Hungerford-Trapp's death.

¶37 But Stough does not include any studies or facts to suggest a causal relationship between supervision and recidivism. At most, Stough asserts that there is a correlation between recidivism and supervision. Division One recently noted that there are no studies or reports indicating that increased supervision leads to lower recidivism. *Bordon*, 122 Wn. App. at 247. As vague as Stough's declaration is, and without any source material to support it, his declaration is speculative at best. We hold that Hungerford failed to raise a genuine issue about whether DOC's failure to rehabilitate Davis caused Hungerford-Trapp's murder.

¶38 Further, DOC does not have a duty enforceable in tort to rehabilitate offenders. *Melville v. State*, 115 Wn.2d 34, 38-39, 793 P.2d 952 (1990). And the purpose of the Sentencing Reform Act of 1981, chapter 9.94A RCW, is primarily punishment, not rehabilitation. RCW 9.94A.010; *see also State v. Rice*, 98 Wn.2d 384, 393, 655 P.2d 1145 (1982) (noting that punishment is the paramount purpose of the adult sentencing system, while the juvenile system "has not utterly abandoned the rehabilitative ideal").

¶39 This rehabilitation argument reveals how tenuous Hungerford's cause of action is. By asking us to require DOC to rehabilitate offenders, Hungerford would have us turn DOC into a guarantor of future good behavior for all offenders. Even if Hungerford could show that DOC's lack of supervision contributed to Davis's recidivism, as a matter of policy, the connection between the ultimate result and DOC's action is too remote to establish liability. Accordingly, we hold that as a matter of law, DOC's alleged failure to closely supervise Davis and rehabilitate him is not the legal cause of Hungerford-Trapp's death.

## II. Duty

¶40 Because duty and proximate cause are often intertwined, we turn next to the question of duty. We determine whether a duty exists as a question of law and, therefore, review the trial court's decision de novo. *Aba Sheikh v. Choe*, 156 Wn.2d 441, 448, 128 P.3d 574 (2006). We hold that the trial court's summary judgment was proper on the independent grounds that DOC did not owe a duty to Hungerford-Trapp.

¶41 We recently addressed DOC's duty to supervise Cecil Davis. *Couch*, 113 Wn. App. at 564. We noted that the general rule is that "an actor 'has no duty to prevent a third person from causing physical injury to another.'" *Couch*, 113 Wn. App. at 564 (quoting *Taggart v. State*, 118 Wn.2d 195, 218, 822 P.2d 243 (1992)). When an actor has a definite, established, and continuing relationship with a third party,

however, that relationship imposes a duty on the actor to control the third person's conduct. *Couch*, 113 Wn. App. at 564. Thus, when an offender is on probation, a probation officer has a take charge relationship with the offender. *Couch*, 113 Wn. App. at 566. And when a take charge relationship exists, the probation officer " 'is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm.' " *Couch*, 113 Wn. App. at 565 (internal quotation marks omitted) (quoting *Taggart*, 118 Wn.2d at 219).

¶42 In *Couch*, however, we concluded that when an offender is only under a legal financial obligation, DOC does not have a special relationship with the offender imposing a duty of care. *Couch*, 113 Wn. App. at 569. And after June 5, 1995, Davis was only under LFO supervision, for both the felony and the misdemeanor. *Couch*, 113 Wn. App. at 561. Accordingly, we held that "DOC did not owe . . . a duty of care . . . at any time after June 5, 1995." *Couch*, 113 Wn. App. at 571.

¶43 Thus, because Davis did not murder Hungerford-Trapp until April 14, 1996, 10 months after DOC's duty ended, DOC did not owe a duty of care to Hungerford-Trapp to control Davis's behavior at the time of her death.

¶44 Instead, Hungerford argues that DOC breached that duty before June 5, 1995, and that this breach caused Hungerford-Trapp's death even though Davis was no longer under direct supervision. Although phrased as a question of proximate cause, Hungerford's argument also asks us to expand DOC's duty to supervise. Hungerford would have us impose a general duty on DOC to report probation violations and extend probation in order to prevent crimes that may occur after active probation supervision ends. We decline to do so.

¶45 Under the public duty doctrine, when a government agency has a general duty to the public as a whole, it does not have an actionable duty to a particular individual. *Laymon v. Dep't of Natural Res.*, 99 Wn. App. 518, 529, 994 P.2d 232 (2000). The duty to supervise offenders on proba-

tion is an exception to the public duty doctrine based on the "special relationship" between the government and the offender. *Joyce*, 155 Wn.2d at 318; *Taggart*, 118 Wn.2d at 219. DOC owes a duty of care to those who an offender might injure while DOC is supervising the offender. *Taggart*, 118 Wn.2d at 220. We hold that once that special relationship ends, the exception to the public duty doctrine expires. Therefore, DOC did not owe a duty to Hungerford-Trapp after DOC's take charge relationship with Davis ended.

¶46 Hungerford points out a DOC rule requiring community corrections officers to report all violations to the court and argues that the DOC rule creates a general duty to report probation violations. But DOC's internal policies and directives do not have the force of law. *Joyce*, 155 Wn.2d at 323. They are evidence of the standard of care and may be evidence of negligence. *Joyce*, 155 Wn.2d at 324. It is, nonetheless, an error for a trial court to instruct a jury on the basis of internal policy directives that DOC is legally responsible for reporting violations of probation conditions. *Joyce*, 155 Wn.2d at 324-25. DOC does not have a legal duty to report all possible probation violations because it has a rule requiring probation officers to report violations. The legal duty is to prevent offenders under active supervision from harming other people while the offender is on probation. While the standard of care for exercising that legal duty may include following DOC rules, the rules do not create an independent legal duty.

¶47 Our holding is a natural extension of our reasoning in *Couch*. In *Couch*, we specifically held that LFO monitoring did not create a duty to prevent future crimes. *Couch*, 113 Wn. App. at 569. We hold that the duty to supervise does not require DOC to prevent future crimes an offender might commit after his supervision ends even when the offender is placed on LFO status. DOC owes a duty to those who are injured during an offender's active supervision, not after it ends. DOC therefore did not owe a duty to Hungerford-Trapp after June 5, 1995.

¶48 Thus, summary judgment was appropriate because there was not a genuine issue of material fact regarding either proximate cause or duty.

¶49 Hungerford also challenges the trial court's ruling that the statute of limitations barred his suit. We do not reach this argument because we affirm the trial court's judgment on other grounds.

¶50 In conclusion, we affirm the trial court's summary judgment that there was no genuine issue of material fact regarding DOC's negligence. Because we do not remand, we need not address the State's cross appeal under RAP 2.4(a).[4]

¶51 Affirmed.

HOUGHTON and PENOYAR, JJ., concur.

Review denied at 160 Wn.2d 1013 (2007).

---

[4] RAP 2.4(a) states as follows: "The appellate court will, at the instance of the respondent, review those acts in the proceeding below which if repeated on remand would constitute error prejudicial to the respondent."