# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | |
|---|---|
| SABRINA RASMUSSEN, | No. 67518-4-I |
| Appellant, | |
| v. | |
| STATE OF WASHINGTON, by and through DEPARTMENT OF CORRECTIONS, | ORDER DENYING MOTION FOR RECONSIDERATION AND AMENDING OPINION |
| Respondent, | |
| PIERCE COUNTY, a municipal corporation, and CITY OF TACOMA, | |
| Defendants. | |

The appellant Sabrina Rasmussen filed a motion for reconsideration. The respondent State of Washington Department of Corrections filed an answer. The panel having determined that the motion should be denied but the opinion amended; now, therefore, it is hereby

ORDERED that the motion for reconsideration is denied. The opinion of this court in the above-entitled case filed April 1, 2013 shall be amended as follows:

1. On Page 19, footnote 12 that states:

> The 2007 Federal Bureau of Investigation report Rasmussen relies on also provides nothing more than speculation that Adhahn would have been deported <u>before</u> 2000.

shall be deleted and replaced with the following:

> The 2007 Federal Bureau of Investigation report Rasmussen relies on also provides nothing more than speculation that Adhahn would have been deported <u>before</u> 2000. Further, Rasmussen's theory of causation is speculative because it depends on when exactly between 1990 and 1997 immigration learned of Adhahn. As Rasmussen's immigration expert Sampson admits, "Between 1990 and July 1997, immigration laws changed significantly."

The remainder of this opinion shall remain the same.

Dated this 1st day of November , 2013.

FILED COURT OF APPEALS DIV 1 STATE OF WASHINGTON 2013 NOV -1 AM 11:00

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

SABRINA RASMUSSEN, )  No. 67518-4-I
                                                     )
                              Appellant,  )  DIVISION ONE
                                                     )
          v.                                )
                                                     )
STATE OF WASHINGTON, by and  )
through DEPARTMENT OF         )
CORRECTIONS,                  )  UNPUBLISHED OPINION
                                                     )
                              Respondent,  )
                                                     )
PIERCE COUNTY, a municipal    )
corporation, and CITY OF TACOMA,  )
                                                     )
                              Defendants.  )  FILED: April 1, 2013

SCHINDLER, J. — In 1990, Terapon Adhahn pleaded guilty to incest in the first

degree. The court found he was eligible for a special sexual offender sentencing

alternative (SSOSA),[1] and imposed a 14-month suspended sentence with an

exceptional sentence of 60 months for sex offender treatment and supervision by the

Department of Corrections (DOC). On July 8, 1997, the court entered an order

terminating sex offender treatment and supervision. In 2007, Adhahn was arrested in

the kidnapping and murder of 12-year-old Zina Linnik. DNA[2] testing linked Adhahn to

the kidnapping and rape of 11-year-old Sabrina Rasmussen on May 31, 2000.

---

[1] Former RCW 9.94A.120(7) (1989). LAWS OF 1989 ch. 252, § 4. The SSOSA was recodified at RCW 9.94A.670 in 2001. LAWS OF 2001, 2d Spec. Sess., ch. 12, § 312.

[2] (Deoxyribonucleic acid.)

Rasmussen appeals summary judgment dismissal of her lawsuit against DOC for negligent supervision. Rasmussen contends DOC had a duty to take reasonable precautions to protect her from the foreseeable dangers posed by Adhahn even after the court terminated supervision on July 8, 1997. In the alternative, Rasmussen contends there are material issues of fact as to whether DOC's supervision from 1990 until July 1997 was the proximate cause of the kidnapping and rape on May 31, 2000. We affirm.

## FACTS

Terapon Adhahn was born in Bangkok, Thailand on August 30, 1964. After his mother married a military officer, the family moved to the United States. After graduating from high school in 1983, Adhahn enlisted in the United States Army.

On March 26, 1990, the State charged Adhahn with rape in the second degree of his half sister. Adhahn pleaded guilty to incest in the first degree. With an offender score of zero, the standard sentence range was 12 to 14 months. The State agreed that if eligible, Adhahn should receive a SSOSA. The plea agreement states Comte and Associates, Inc. should evaluate Adhahn to determine whether he was eligible for a SSOSA. If not eligible, the State would recommend 14 months of confinement.

Sex offender treatment therapist Michael Comte conducted an evaluation of Adhahn. Comte described personality and behavior problems, but notes Adhahn had no prior criminal history and he recognized the need to address "his poor impulse control." The evaluation states, in pertinent part:

> Mr. Adhahn presents some symptoms characteristic of unresolved post-traumatic stress related to his childhood sexual victimization, which was probably an additional contributor to his later sexual deviancy. Personality and behavioral problems were influenced by parental

abandonment, economic deprivation and the cultural adjustments necessitated by his move from Thailand to the United States when he was 12 years old. Apparently, he has always sought to compensate for over-stress, anger and frustration by escapist behavior. He sexually molested his half-sister when she was three and he later developed alcoholism. These compensations allow him temporary respite from inner turmoil and frustration. He has probably been depressed throughout his life.

. . . .

Unlike many rapists, Mr. Adhahn does not seem to have an antisocial (criminal) orientation. He does not have a criminal history and he has generally been conforming to societal expectations. He has some recognition of his poor impulse control and army life has provided him the external structure and control to contain him. He is alcoholic and he has some recognition that it is even more difficult to control himself under the influence. He is actively involved in treatment for his alcoholism and stress problems, but there is no question he has a long way to go.

Comte concluded Adhahn was "amenable to treatment and a manageable risk to be at large." However, because it was "unlikely treatment goals can be satisfied within the two years" authorized under the SSOSA, Comte recommended Adhahn agree to an exceptional 60-month sentence of sex offender treatment and community supervision.

Very few offenders are able to accomplish their treatment goals within that time frame. I am, therefore, requesting Mr. Adhahn and his attorney stipulate to an exceptional five year probation sentence, which would allow adequate time to complete treatment goals and to de-escalate him from intensive weekly psychotherapy. Ongoing and active probation supervision would allow the criminal justice professionals to monitor his movements and activities in the community to ensure there is no relapse in his alcoholism and control of his anger and sexual impulses.

At the sentencing hearing on September 4, 1990, the court found Adhahn was eligible for a SSOSA. The court imposed a suspended sentence of 14 months on condition that he serve 60 days in the Pierce County jail. The judgment and sentence requires inpatient sex offender treatment with a "qualified provider; such treatment to be successfully followed - completed." Adhahn agreed to an exceptional sentence of 60

months for sexual offender treatment and community supervision.[3] The judgment and sentence states that "treatment provider of opinion 60 months necessary for treatment." The court also ordered Adhahn to successfully complete an alcohol counseling program, remain in the State of Washington "unless [he] receives military orders removing him from State," and no contact with the victim unless approval by the victim, her therapist, and Adhahn's therapist.

After entry of the judgment and sentence, Adhahn enrolled in an alcohol treatment program, registered as a sex offender, and contacted a certified sex offender treatment provider at Comte and Associates, Daniel DeWaelsche.

On March 19, 1991, DOC filed a notice of violation requesting the court schedule a hearing. DOC alleged Adhahn violated the terms of the judgment and sentence by failing to enter into sex offender treatment. According to the report, Adhahn had served 60 days in jail as ordered by the court. However, since his release, Adhahn had "spent a great deal of his time looking for employment" and was struggling financially. The report states that Adhahn "is currently involved in treatment for substance abuse at Tacoma TASC.[4] He goes in weekly for urinalysis . . . . He has not yet begun out-patient counseling but is expected to do so in the very near future."

By July 31, Adhahn had successfully completed the alcohol treatment program. The discharge report states, in pertinent part:

> Adhahn did very well at TASC, complied with all the terms of his TASC treatment contract. He completed all required sessions of outpatient counseling both at the Alliance and the Center. In addition, he faithfully attended AA[5] meetings, and met [his case manager] twice monthly.

---

[3] Because Adhahn was in the military, the court allowed him to serve 30 days in one year and 30 days the following year.

[4] (Treatment Alternatives for Safe Communities.)

[5] (Alcoholics Anonymous.)

4

The discharge report recommends Adhahn begin sex offender treatment and continue to attend AA meetings. Adhahn began sex offender treatment with DeWaelsche on October 29.

At the violation hearing on November 27, the court entered an agreed order modifying the terms of the judgment and sentence. The order states that Adhahn shall enter sex offender treatment "no later than 11/01/91," and the exceptional sentence for 60 months of treatment and supervision should begin on November 1. Adhahn participated in sex offender treatment with DeWaelsche from November 1991 until July 1997. Throughout treatment, DeWaelsche submitted quarterly reports.

In 1992, the Washington State Patrol (WSP) contacted DOC to report Adhahn was arrested by Tacoma police in June for unlawful display of a weapon. In September 1992, the municipal court found Adhahn guilty of intimidation with a weapon and sentenced him to serve five days in the Pierce County jail.

In the quarterly report DeWaelsche sent to the community corrections officer (CCO) and the Pierce County Prosecutor's Office in January 1994, DeWaelsche expressed concerns about Adhahn's recent disclosure about driving home a woman, later identified as a prostitute, and the previous misdemeanor conviction for unlawful display of a weapon. The report states, in pertinent part:

> Throughout treatment, Terapon has made great efforts to complete all assigned work, participate in the group process and shows a genuine interest in his treatment. His progress in therapy has been commendable. However, during a recent group therapy session, he disclosed he had picked up a young woman on South Tacoma Way just after leaving work. . . .
> This may be cause for concern as it is the second issue within the past two years that involved Terapon being in highly questionable situations. As you will recall, approximately one year ago, he had gone to

5

a local night club, which was off limits to him. He became involved that evening with an individual who had a weapon on him. The latest incident similarly involves an individual of questionable character, but whom he says he knows vaguely. He will be submitting to a polygraph examination in January. This issue will be addressed more thoroughly then.

On August 6, 1996, the court scheduled a treatment termination review hearing. The order states that by the time of the hearing, Adhahn shall complete a polygraph and plethysmograph exam. The judge also ordered "[t]he State is to check for any criminal charges against the defendant since 11/90." The termination review hearing took place on July 8, 1997.

Before the hearing, DeWaelsche submitted a letter stating Adhahn had "completed all aspects of the sex offender treatment program" and he would "graduate from treatment at the end of July 1997." The letter states, in pertinent part:

> Throughout treatment, Terapon has been an active and cooperative group therapy member. He has willingly participated in the treatment process, and offered valuable input during his group therapy sessions. He has exhibited empathy for his victim, and has a clear understanding of his offense cycle. Furthermore, Terapon has demonstrated that he is using the skills and techniques, gleaned in sex offender treatment, on a day-to-day basis to avoid recidivism. Terapon's treatment plan addressed the following issues:
> - Sexually deviant arousal
> - Identification of deviant behavior patterns
> - Disruption of deviant behavior patterns
> - Victim clarification awareness
> - Empathy training
> - Assertiveness/anger management
> - Thinking errors
> - Sex education
> - Social skills
> - Relapse prevention
>
> As long as Terapon positions himself by choice to remain offense-free, his potential to recidivate vastly diminishes. He is aware he may see me free of charge any time he feels there is a need in the future. It has been a pleasure working with Terapon.

At the review hearing on July 8, the prosecutor informed the court that Adhahn successfully completed sex offender treatment. The prosecutor also told the court that according to the CCO, Adhahn had "completed all other aspects" of his treatment and supervision.

> The defense provided me with a letter dated July 3rd of 1997, which a copy has been filed with the Court, from Dan DeWalshe [sic] which does indicate that the defendant has completed all aspects of the sex offender treatment program and he is set to graduate the end of July of 1997.
> I also made a phone call to [the CCO] in this case, to determine whether there were any other aspects of this file that needed to be completed in the form of legal financial obligations or otherwise, since I haven't been the prosecutor on this file, and [the CCO] indicated to me that the defendant had completed all other aspects of the file.

The court entered an order terminating sex offender treatment and DOC supervision.

The order states, in pertinent part:

> IT IS HEREBY ORDERED, ADJUDGED and DECREED that:
> 1)   The requirement of treatment in this cause is hereby terminated;
> 2)   The requirement of supervision in this cause is hereby terminated;
> 3)   All other conditions and requirements of the Judgment and Sentence dated 9/4/90, remain in full force and effect.

Adhahn was classified as a Level I sex offender, the lowest risk classification. In April 2002, the WSP stopped Adhahn for a traffic infraction. Adhanh re-registered as a sex offender with the WSP on April 2. Adhahn moved several times after April 2002 without re-registering as a sex offender.

In July 2007, Adhahn was arrested as a suspect in the kidnapping and murder of 12-year-old Zina Linnik. Adhahn confessed to kidnapping and murdering Linnik. DNA testing linked Adhahn to the kidnapping and rape of 11-year-old Sabrina Rasmussen on May 31, 2000. The Pierce County Sheriff's Office requested the prosecuting attorney to

issue a warrant to arrest Adhahn for failure to register as a sex offender. United States Immigration and Customs Enforcement notified Adhahn that he was subject to removal because he had been convicted of two crimes of moral turpitude. Adhahn did not contest deportation, and asked "to be deported as soon as possible." On July 19, the State charged Adhahn with the kidnapping and rape of Rasmussen on May 31, 2000.

On September 21, 2010, Rasmussen filed a lawsuit against DOC, Pierce County, and the City of Tacoma. Rasmussen alleged DOC failed to "adequately monitor or control" Adhahn after the court terminated supervision. Rasmussen also alleged that but for DOC's negligence before termination of supervision, Adhahn "could have been jailed or deported." Rasmussen alleged that Pierce County breached its statutory duty to report Adhahn to the United States immigration authorities when he was in jail for five days on the misdemeanor conviction in 1992.

Rasmussen also alleged Pierce County and the City of Tacoma breached the duty to require Adhahn to register as a sex offender. Rasmussen asserted that if Adhahn had been convicted of failure to register after July 2002, it was "less likely" he would have committed the kidnapping and rape.

> Had Adhahn been convicted of failing to register after July 1, 2002, his DNA would have been drawn and he would have been linked to the 2000 rape of Sabrina Rasmussen. Had Adhahn been registered at his 2000 address, he would have been linked to Ms. Rasmussen's rape at that time because registered sex offenders in the area are primary suspects in any new sex offense. If Adhahn had been compelled to register, it is substantially less likely he would have raped Ms. Rasmussen.

Rasmussen also alleged the City of Tacoma negligently misclassified Adhahn as a Level I sex offender.

Pierce County filed a CR 12(b)(6) motion to dismiss for failure to state a claim. Pierce County asserted that as a matter of law, neither the 1990 conviction for incest in the first degree nor a conviction for failure to register as a sex offender would have resulted in deportation. Pierce County also argued the claim that Adhahn would have been deported if the 1992 misdemeanor conviction for intimidation with a weapon had been reported, was speculative.

In opposition, Rasmussen argued Pierce County breached the duty to enforce the sex offender registration requirements, to properly classify Adhahn, and to report the 1992 misdemeanor conviction to the immigration authorities and to the court at the treatment termination hearing on July 8, 1997. The court granted the motion to dismiss the claims against Pierce County.

DOC filed a motion for summary judgment. DOC argued that as a matter of law, it did not have a duty to monitor or control Adhahn after the court terminated supervision on July 8, 1997. DOC also argued that any breach of the duty to supervise Adhahn before the court terminated supervision was not the proximate cause of the kidnapping and rape on May 31, 2000. DOC argued that even if the court had revoked the SSOSA, it would not have prevented the kidnapping and rape in 2000. DOC asserted that because the undisputed record showed Adhahn was never in DOC custody, it had no duty to report his immigration status or require him to register as a sex offender. DOC submitted the court order terminating supervision, evidence that Adhahn was "never committed to a state correctional facility," and the declaration of a corrections officer with the Pierce County Detention and Corrections Center stating that the United States Immigration and Naturalization Service came to the jail "every weekday" in 1992 but did

not place an immigration hold on Adhahn. DOC also submitted the declaration of an attorney with expertise on immigration law, Manuel Rios. Rios states that as a matter of law, neither the 1990 conviction for incest in the first degree, nor a conviction for failure to register as a sex offender, were offenses that would have subjected Adhahn to deportation.

In opposition, Rasmussen submitted the declaration of former CCO William Stough, the declaration of a former Pierce County deputy prosecutor, and the declaration of a former immigration officer, John Sampson.

The court granted summary judgment and dismissed the claims against DOC. Rasmussen appealed the orders dismissing Pierce County and DOC. Rasmussen later withdrew the appeal of the order dismissing Pierce County.

ANALYSIS

To establish DOC is liable for the May 31, 2000, kidnapping and rape, Rasmussen must establish (1) DOC owed her a duty, (2) breach of that duty, and (3) injury proximately caused by the breach. Hansen v. Friend, 118 Wn.2d 476, 479, 824 P.2d 483 (1992).

Duty

Relying on Petersen v. State, 100 Wn.2d 421, 671 P.2d 230 (1983), Rasmussen contends DOC had a duty to protect her from the foreseeable danger posed by Adhahn after the court terminated supervision on July 8, 1997. The existence of a duty is a question of law that we review de novo. Sheikh v. Choe, 156 Wn. 2d 441, 448, 128 P.3d 574 (2006).

Unless a special relationship exists to control the third person's conduct, there is no duty to prevent a third person from causing harm. RESTATEMENT (SECOND) OF TORTS § 315 (1965). Absent a special relationship, "the actor is not subject to liability if he fails, either intentionally or through inadvertence, to exercise his ability so to control the actions of third persons as to protect another from even the most serious harm." RESTATEMENT (SECOND) OF TORTS § 315 cmt. b.

Restatement (Second) of Torts section 315 states, in pertinent part:

> There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless
> (a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or
> (b) a special relation exists between the actor and the other which gives to the other a right to protection.[6]

In Petersen, the patient had been involuntarily committed to Western State Hospital. Petersen, 100 Wn.2d at 422-23. The psychiatrist knew the patient was having hallucinations, would likely revert to using drugs and was dangerous, but did not seek additional commitment or take any other precautions. Petersen, 100 Wn.2d at 428-29. Five days after his release, while under the influence of drugs, the patient injured Cynthia Petersen when he ran a red light and struck her car. Petersen, 100 Wn.2d at 422-23.

Because the psychiatrist continued to exercise a high degree of control over the patient, the court held that under section 315 of the Restatement (Second) of Torts, the psychiatrist had "a duty to take reasonable precautions to protect anyone who might

---

[6] The special relationships indentified in the Restatement (Second) of Torts sections 316-20 (1965) are parent/child, master/servant, possessor of land or chattels/licensee, one who takes charge of a third person, and person having custody of another.

foreseeably be endangered" by the patient's drug-related mental problems. Petersen, 100 Wn.2d at 427-28.

DOC contends that unlike in Petersen, it did not have a duty to control Adhahn or protect Rasmussen from harm three years after the court entered an order terminating supervision. DOC relies on Hungerford v. Dep't of Corr., 135 Wn. App. 240, 139 P.3d 1131 (2006), review denied, 160 Wn.2d 1013, 161 P.3d 1027 (2007).

In Hungerford, DOC supervised an offender after his release from prison for a felony assault conviction. Hungerford, 135 Wn. App. at 247. The court later terminated supervision except for monitoring payment of his legal financial obligations. Hungerford, 135 Wn. App. at 248. Approximately ten months after termination of supervision, the offender murdered Hungerford-Trapp. Hungerford, 135 Wn. App. at 249. The Estate appealed summary judgment dismissal of the lawsuit against DOC for negligent supervision. Hungerford, 135 Wn. App. at 249. On appeal, the court concluded that monitoring an offender only for legal financial obligations did not create a special relationship, and held that DOC did not have a take-charge relationship after active supervision ended. Hungerford, 135 Wn. App. at 257-58.[7]

> We hold that the duty to supervise does not require DOC to prevent future crimes an offender might commit after his supervision ends even when the offender is placed on [legal financial obligation] status. DOC owes a duty to those who are injured during an offender's active supervision, not after it ends.

Hungerford, 135 Wn. App. at 258.

Rasmussen contends Hungerford was wrongly decided and conflicts with Petersen. We disagree. In Taggart v. State, 118 Wn.2d 195, 822 P.2d 243 (1992), the

---

[7] See also Couch v. Dep't of Corr., 113 Wn. App. 556, 54 P.3d 197 (2002), review denied, 149 Wn.2d 1012, 69 P.3d 874 (2003).

supreme court clarified <u>Petersen</u> and the type of special relationship necessary to create a duty to control the conduct of another to prevent harm.

In <u>Taggart</u>, two persons injured by parolees in separate assaults filed lawsuits alleging the State negligently released and supervised the parolees. <u>Taggart</u>, 118 Wn.2d at 198. In evaluating whether the State owed a duty to the plaintiffs, the court addressed <u>Petersen</u>.

> <u>Petersen</u> . . . stands for the proposition that a "special relation" exists between a state psychiatrist and his or her patients, such that when the psychiatrist determines, or pursuant to professional standards should determine, that a patient presents a reasonably foreseeable risk of serious harm to others, the psychiatrist has "a duty to take reasonable precautions to protect anyone who might foreseeably be endangered."

<u>Taggart</u>, 118 Wn.2d at 218-19 (quoting <u>Petersen</u>, 100 Wn.2d at 428). The court held that under section 319 of the <u>Restatement (Second) of Torts</u> (1965), the relationship between an offender subject to supervision and DOC creates a duty to exercise reasonable care of control to prevent reasonably foreseeable harm to others. <u>Taggart</u>, 118 Wn.2d at 219-20. <u>Restatement (Second) of Torts</u> section 319 states:

> One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm.

But the court emphasized that the duty exists only where there is a " 'definite, established and continuing relationship between the defendant and the third party.' " <u>Taggart</u>, 118 Wn.2d at 219 (quoting <u>Honcoop v. State</u>, 111 Wn.2d 182, 193, 759 P.2d 1188 (1988)). <u>See also</u> <u>Hertog v. City of Seattle</u>, 138 Wn.2d 265, 276, 979 P.2d 400 (1999); <u>Joyce v. Dep't of Corr.</u>, 155 Wn.2d 306, 319-20, 119 P.3d 825 (2005).

Rasmussen argues that here, as in <u>Petersen</u>, DOC had a duty to take reasonable measures to guard against the foreseeable dangers posed by Adhahn after the take-charge relationship terminated. However, unlike in <u>Petersen</u>, there was no " 'definite, established and continuing relationship' " after the court terminated supervision on July 8, 1997. <u>Taggart</u>, 118 Wn.2d at 219 (quoting <u>Honcoop</u>, 111 Wn.2d at 193).[8] We hold that after the court terminated supervision, DOC did not have a take-charge duty under <u>Restatement (Second) of Torts</u> section 319.

<u>Proximate Cause</u>

In the alternative, Rasmussen contends there are material issues of fact as to whether DOC's negligent supervision from September 1990 until July 1997 was the proximate cause of the kidnapping and rape on May 31, 2000.

We review summary judgment de novo. <u>Hartley v. State</u>, 103 Wn .2d 768, 774, 698 P.2d 77 (1985). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c).

The defendant on summary judgment has the burden of showing the absence of evidence to support the plaintiff's case. <u>Young v. Key Pharms., Inc.</u>, 112 Wn.2d 216, 225, 770 P.2d 182 (1989). Once the moving party shows an absence of a genuine issue of material fact, the burden shifts to the nonmoving party. <u>Young</u>, 112 Wn.2d at 225.

---

[8] The out of state case cited by Rasmussen, <u>Estates of Morgan v. Fairfield Family Counseling Center</u>, 77 Ohio St. 3d 284, 1997-Ohio-194, 673 N.E.2d 1311, is also distinguishable. In <u>Morgan</u>, the court noted the importance of establishing the therapist's control over the patient; otherwise, "it would be tantamount to imposing strict liability to require the defendant to control a third person's conduct where he lacks the ability to do so." <u>Morgan</u>, 77 Ohio St. 3d at 298.

While we construe the evidence and reasonable inferences in the light most favorable to the nonmoving party, if the nonmoving party " 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial,' " summary judgment is proper. Young, 112 Wn.2d at 225 (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)); Jones v. Allstate Ins. Co., 146 Wn.2d 291, 300-01, 45 P.3d 1068 (2002).

The nonmoving party may not rely on speculation to create a material issue of fact. Ranger Ins. Co. v. Pierce County, 164 Wn.2d 545, 552, 192 P.3d 886 (2008). "[M]ere allegations, denials, opinions, or conclusory statements" do not establish a genuine issue of material fact. Int'l Ultimate, Inc. v. St. Paul Fire & Marine Ins. Co., 122 Wn. App. 736, 744, 87 P.3d 774 (2004).

To establish cause in fact, Rasmussen must show a direct, unbroken sequence of events that link the acts or omissions of DOC and the harm. Joyce, 155 Wn.2d at 322. Cause in fact is usually a question for a jury, but where reasonable minds cannot differ, it may be determined as a matter of law. Joyce, 155 Wn.2d at 322. Legal causation is grounded in the determination of how far the consequences of a defendant's act should extend, and focuses on whether the connection between the defendant's act and the result is too remote or inconsequential to impose liability. Hartley, 103 Wn.2d at 778-79.

Relying on Joyce, Rasmussen argues DOC's failure to investigate and report violations of the judgment and sentence was the proximate cause of the kidnapping and rape on May 31, 2000. Rasmussen argues that Adhahn violated a number of the

conditions of the judgment and sentence, including the failure to obtain an AA sponsor or attend AA meetings, consuming alcohol in 1992, and having contact with the victim. Rasmussen also asserts DOC did not monitor whether Adhahn re-registered as a sex offender, did not notify the court about the 1992 misdemeanor conviction for intimidation with a weapon, or provide that information to the court before the termination hearing.[9] Rasmussen contends that as in Joyce, but for breach of the duty to supervise and report violations of the judgment and sentence, Adhahn would have been in jail on May 31, 2000.

In Joyce, DOC was responsible for supervising an offender convicted of assault and possession of stolen property. Joyce, 155 Wn.2d at 309. Approximately one week after DOC filed a notice of violation and requested a court hearing, the offender stole a vehicle while under the influence of marijuana, struck the plaintiff's vehicle, and killed her. Joyce, 155 Wn.2d at 313-14.

The Estate sued DOC for negligent supervision. Joyce, 155 Wn.2d at 314. The evidence at trial showed the offender did not comply with any of the conditions of the judgment and sentence, and that DOC knew the offender had been admitted to psychiatric institutions and was using illegal drugs. Joyce, 155 Wn.2d at 312-14. Former CCO William Stough testified that if DOC had obtained a bench warrant, the offender would have been in jail on the date of the car accident that killed the plaintiff. Joyce, 155 Wn.2d at 322.

DOC appealed the jury verdict, arguing the court erred in denying its motion to dismiss because it did not owe a duty to the plaintiff. Joyce, 155 Wn.2d at 314-15. The

---

[9] Rasmussen also argues DOC breached its duty by incorrectly classifying Adhahn as a Level I sex offender. But it is undisputed that Adhahn was never in DOC custody and Rasmussen concedes she was unable to locate any documentation concerning the classification decision.

supreme court concluded the evidence supported the jury finding that but for DOC's breach of its duty to investigate and report numerous violations of the judgment and sentence, the offender would have been in jail. Joyce, 155 Wn.2d at 322. The court held there was "a direct, unbroken sequence of events" that linked the offender's actions with the injury to the plaintiff. Joyce, 155 Wn.2d at 322.

> It is undisputed that [the offender] committed numerous violations of his supervision that were not reported to the court or diligently pursued by community corrections officials. A court had previously sentenced [the offender] to jail time for reported violations. Joyce's expert, William Stough, testified that if [DOC] had obtained a bench warrant for [the offender] prior to the accident, he "would have been in jail, either awaiting a hearing or doing time on the violations" without bail on [the date of the car accident that killed Joyce].

Joyce, 155 Wn.2d at 322.

Here, construing the evidence in the light most favorable to Rasmussen, there is not a direct, unbroken sequence of events that linked the alleged violations of the judgment and sentence to the kidnapping and rape on May 31, 2000. There is no dispute that Adhahn successfully completed sex offender treatment and the court terminated supervision on July 8, 1997.

Further, unlike in Joyce, here, Stough did not testify that Adhahn would have been in jail when he kidnapped and raped Rasmussen on May 31, 2000. According to Stough, the court would have revoked Adhahn's SSOSA "on the spot." Stough states that if DOC had properly supervised Adhahn and reported violations to the court, including the 1992 misdemeanor conviction for intimidation with a weapon and failure to re-register as a sex offender, "the judge would have promptly revoked Adhahn's SSOSA and sent him off to prison." And according to a former Pierce County deputy prosecutor, the 1992 misdemeanor conviction, the allegation that Adhahn was

17

continuing to consume alcohol, and failure to register as a sex offender after changing addresses, "if proven by a preponderance of the evidence at a review hearing . . . , would have resulted in the court imposing harsh, additional sanctions on Mr. Adhahn, including periods of confinement in the Pierce County Jail."[10]

Even if DOC had reported the alleged violations of the judgment and sentence to the court and the court revoked the SSOSA, the maximum period of incarceration the court could impose was 12 months. And, as DOC points out, if the State proved Adhahn violated the terms of the judgment and sentence and the court had decided to not revoke the SSOSA, DOC supervision would have ended before July 1997. In State v. Onefrey, 119 Wn.2d 572, 835 P.2d 213 (1992), the supreme court held that the court did not have the authority to impose more than two years of treatment and supervision under a SSOSA, former RCW 9.94A.120(7). The explicit language of former RCW 9.94A.120(7)(a) limits treatment and supervision to two years. Onefrey, 119 Wn.2d at 574-577 ("If Onefrey could not be treated within the requisite 2 years, then he was outside the population that the Legislature intended to be eligible for SSOSA. The language of the statute limiting the term of treatment allowed is susceptible to no other interpretation.")

Rasmussen also claims that if DOC had notified the immigration authorities about his 1990 conviction for incest in the first degree and the 1992 misdemeanor conviction of intimidation with a weapon, as well as failure to register as a sex offender, Adhahn would have been deported.

---

[10] The former prosecutor also speculates that Adhahn could have been charged and convicted of felony charges based on the misdemeanor conviction. But the former Pierce County deputy prosecutor does not state that Adhahn would have been in jail on May 31, 2000.

Because it is undisputed that Adhahn was never in DOC custody, DOC did not have a duty to report to the immigration authorities.[11] And, as a matter of law, neither the conviction in 1990 for incest in the first degree, the 1992 misdemeanor conviction, nor failure to register as a sex offender would have subjected Adhahn to deportation.

Rasmussen's immigration expert Sampson admits that Adhahn was not subject to deportation for the 1990 incest conviction. Sampson mischaracterizes the misdemeanor conviction of intimidation with a weapon as a felony, and then speculates that if Adhahn had been convicted of felony possession of a firearm under federal law, he would have been subject to deportation. Sampson also claims that if Adhahn had been convicted of failure to register as a sex offender, he would have been subject to deportation. However, failure to register as a sex offender is not a crime that would have subjected Adhahn to deportation. Pannu v. Holder, 639 F.3d 1225, 1227-28 (9th Cir. 2011); Efagene v. Holder, 642 F.3d 918, 922-23 (10th Cir. 2011).[12] In sum, absent speculation, there is no direct, unbroken sequence of events that connect the alleged negligent supervision of DOC before the court terminated supervision and the kidnapping and rape three years later.

---

[11] RCW 10.70.140 states:

Whenever any person shall be committed to a state correctional facility, the county jail, or any other state or county institution which is supported wholly or in part by public funds, it shall be the duty of the warden, superintendent, sheriff or other officer in charge of such state or county institution to at once inquire into the nationality of such person, and if it shall appear that such person is an alien, to immediately notify the United States immigration officer in charge of the district in which such penitentiary, reformatory, jail or other institution is located, of the date of and the reasons for such alien commitment, the length of time for which committed, the country of which the person is a citizen, and the date on which and the port at which the person last entered the United States.

[12] The 2007 Federal Bureau of Investigation report Rasmussen relies on also provides nothing more than speculation that Adhahn would have been deported before 2000.

We affirm summary judgment dismissal of Rasmussen's claims against DOC.[13]

WE CONCUR:

---

[13] For the first time in the reply brief, Rasmussen makes an argument based on <u>Restatement (Second) of Torts</u> section 302B (1965). We do not address arguments raised for the first time in reply. <u>Cowiche Canyon Conservancy v. Bosley</u>, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).