[No. 61137-2-I.   Division One.   January 20, 2009.]

CARMEN ROLLINS ET AL., *Respondents*, v. KING COUNTY METRO TRANSIT, *Appellant*.

372

*Daniel T. Satterberg, Prosecuting Attorney*, and *Daniel L. Kinerk* and *Linda M. Gallagher, Deputies*, for appellant.

*Andrew Schwarz*; and *Kenneth R. Friedman* (of *Friedman Rubin & White*), for respondents.

*Stewart Andrew Estes* on behalf of Washington Defense Trial Lawyers, amicus curiae.

*James P. Richmond* and *Joe R. Larson, Jr.*, on behalf of Washington State Transit Insurance Pool and Pierce Transit, amici curiae.

*Bryan P. Harnetiaux* and *Tim M. Higgins* on behalf of Washington State Association for Justice Foundation, amici curiae.

¶1 ELLINGTON, J. — Where there is no issue of joint and several liability and plaintiffs seek damages only for injuries caused by a single defendant's negligence, there is no need to instruct the jury to segregate damages caused by intentional conduct. In this case, two teenagers on a bus were attacked by unknown assailants. They sued King

County Metro Transit, alleging it neglected its duties as a common carrier in failing to maintain a safe environment. The court instructed the jury it could award damages only for those injuries proximately caused by Metro's negligence and refused to instruct on contributory negligence. Both decisions were within the court's discretion, and we affirm.

## BACKGROUND

¶2  On a Saturday night in May 2005, teenagers Carmen Rollins, Wilhelm Hendershott, and Karensa Umipeg were riding a Metro bus.[1] They were heading to Rollins' home. The articulated bus was mostly empty, and the three had the back half of the bus to themselves.

¶3  At a stop in Columbia City, approximately 35 to 50 rowdy teenagers boarded. The group occupied every available seat on the bus and stood in the aisles. The crowd was pushing, yelling, cursing, and talking about fighting. Some were "throwing up hand signs" suggesting gang affiliations.[2] Some talked about having come from a party and being high and drunk. Some indicated they were "strapped," suggesting they were armed with guns.[3] One of the young men "ran [his] hands up" Rollins' thigh and made suggestive remarks.[4] Rollins looked down and tried to ignore him.

¶4  When the bus started moving, a fight broke out. People in the back of the bus were punching each other, "flying back and forth," and having a "brawl."[5] In the front of the bus, people were screaming at each other, hanging from the bars, and walking around.

¶5  After the fighting broke out, one of the boys involved in the fracas repeatedly called Rollins "the B word" and said, "can me and N words hit it? We're going to run a train

---

[1] Rollins worked at a downtown movie theater and routinely took the bus home late at night.

[2] Report of Proceedings (RP) (Nov. 27, 2007) at 57.

[3] RP (Nov. 29, 2007) at 357.

[4] RP (Nov. 27, 2007) at 130.

[5] RP (Nov. 29, 2007) at 358.

on you."[6] Rollins and her friends understood this as a reference to having sex with her as a group.

¶6 Rollins and her friends made no response and pulled the signal for the next stop. The crowd taunted them. Finally Hendershott spoke up and said Rollins "is not a bitch."[7] One of the young men then punched Hendershott in the face. Hendershott stood up to get off the bus,[8] and then "it was like an explosion, everyone around him and up in the front just like surged forward and started punching him and kicking him and grabbing at him."[9] Rollins also got up, and a group of people began hitting her in the head and face and pulling out her hair. Someone pulled Rollins' pants down, pulled her to the floor, and kept hitting her.

¶7 Umipeg yelled at the boys to stop their attack, but girls sitting next to her grabbed her head and slammed it against the window. Umipeg screamed at the bus driver to call the police. He did not respond.[10] Umipeg tried to call 911 on her cell phone, but it was knocked from her hands.

¶8 When the bus arrived at the next stop, the driver opened both front and rear doors. Hendershott was shoved off the bus and landed on all fours. Someone kicked him in the face. The group continued to kick and punch him. They talked about knives and guns, so Hendershott made no attempt to fight back; he curled into a ball and waited for the attack to end.

¶9 Rollins was pulled head first out of the bus. She saw Hendershott on the ground. When she tried to go to him, some "girls ran off the bus and started ripping [her] hair

---

[6] RP (Nov. 29, 2007) at 360.

[7] RP (Nov. 27, 2007) at 132.

[8] A sign posted near the rear door of Metro buses states the rear doors are not to be opened after 7 p.m.

[9] RP (Nov. 27, 2007) at 65.

[10] The driver testified that he called dispatch when he heard someone yell "fight" and that the dispatcher told him the police were on the way.

out."[11] The assailants ran on and off the bus while it was stopped.[12] People also opened and jumped out of the bus windows.

¶10 Umipeg got off the bus and saw Rollins lying on ground as people were stomping on her. She saw Hendershott being beaten by a bunch of young men. She ran to the front of the bus and asked the driver, "Why aren't you doing anything? Call the cops."[13] The bus driver did not react; he "just looked at [her]."[14] Umipeg called 911.

¶11 When someone announced that police had been called, most of the assailants ran back onto the bus, which then drove away.

¶12 The police arrived and called for an ambulance. Hendershott and Rollins were taken to the hospital. One of the cruisers went after the bus, but the assailants were never apprehended.

¶13 At trial, the driver testified he did not notice any altercation on the bus. His incident report of the following morning, however, stated there was a fight on the bus and at the bus stop that involved about 50 people.

¶14 The jury found that Metro's negligence caused damage in the amount of $138,520 for Rollins and $127,196 for Hendershott.

## DISCUSSION

■■ ¶15 Metro's appeal raises issues relating to segregation and allocation of damages. Specifically, Metro contends the court erred in failing to give its proposed jury

---

[11] RP (Nov. 29, 2007) at 364.

[12] The driver denied this because he had secured the back door when people first left the bus. He also testified, however, that the back door did not close when he pushed the button and he had to shut the door manually.

[13] RP (Nov. 27, 2007) at 68.

[14] *Id.*

instructions and special verdict form. We review these decisions for abuse of discretion.[15]

## Segregation of Damages

¶16 Metro proposed a jury instruction stating the plaintiffs must prove "the percentage of damages caused by negligent conduct and the percentage of damages caused by the assailants' intentional conduct."[16] Metro also proposed a special verdict form requiring the jury to calculate these percentages. Along with amici Washington Defense Trial Lawyers and the Washington Transit Insurance Pool and Pierce Transit,[17] Metro contends the proposed instructions were required by *Tegman v. Accident & Medical Investigations, Inc.*[18]

■■ ¶17 Metro's argument illustrates the considerable confusion that surrounds application of the tort reform act of 1986, chapter 4.22 RCW, and subsequent case law. The tort reform act modified Washington's approach to joint and several liability, making several liability the general rule.[19] It provides, in part, as follows:

> In all actions involving fault of more than one entity, the trier of fact shall determine the percentage of the total fault which is attributable to every entity which caused the claimant's damages except entities immune from liability to the claimant under Title 51 RCW. The sum of the percentages of the total fault attributed to at-fault entities shall equal one hundred percent. . . . Judgment shall be entered against each defendant except those who have been released by the claimant or are immune from liability to the claimant or have prevailed on any

---

[15] *Stiley v. Block*, 130 Wn.2d 486, 498, 925 P.2d 194 (1996). An abuse of discretion occurs when the court's decision rests on untenable grounds or reasons. *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971).

[16] Clerk's Papers at 103.

[17] The court also received an amicus brief from the Washington State Trial Lawyers Association Foundation. The foundation changed its name to the Washington State Association for Justice Foundation effective January 1, 2009.

[18] 150 Wn.2d 102, 75 P.3d 497 (2003).

[19] *Washburn v. Beatt Equip. Co.*, 120 Wn.2d 246, 294, 840 P.2d 860 (1992).

other individual defense against the claimant in an amount which represents that party's proportionate share of the claimant's total damages. The liability of each defendant shall be several only and shall not be joint.[20]

The statute defines "fault" as "acts or omissions, including misuse of a product, that are in any measure negligent or reckless . . . or that subject a person to strict tort liability or liability on a product liability claim."[21] "Fault" as defined in the act does not include intentional torts.[22]

¶18 The statute makes exceptions. Relevant to our consideration here, joint liability is preserved where the plaintiff is not at fault.[23]

¶19 Our Supreme Court interpreted these provisions in *Welch v. Southland Corp.*[24] There, plaintiff Mark Welch was robbed and shot by a fellow patron at a 7-11 convenience store. The assailant was never apprehended. Welch sued Southland, owner of the 7-11 store, alleging it negligently failed to maintain safe premises for business invitees. As an affirmative defense, Southland argued that fault should be apportioned between the negligent and intentional actors under RCW 4.22.070. But under the statute, apportionment occurs only between at fault entities, which do not include intentional tortfeasors. The Supreme Court thus held that a negligent defendant is not entitled to apportion liability to an intentional tortfeasor.[25] Because Welch's assailant was not "at fault" under the

---

[20] RCW 4.22.070(1).

[21] RCW 4.22.015 ("The term also includes breach of warranty, unreasonable assumption of risk, and unreasonable failure to avoid an injury or to mitigate damages.").

[22] *Id.*; *Welch v. Southland Corp.*, 134 Wn.2d 629, 634, 952 P.2d 162 (1998).

[23] RCW 4.22.070(1)(b).

[24] 134 Wn.2d 629, 952 P.2d 162 (1998).

[25] *Id.* at 634.

statute, Southland was not permitted to allocate liability to him.[26]

¶20 Five years later, in *Tegman,* the court considered how to allocate liability where the conduct of multiple defendants is negligent, intentional, or both. Specifically, the court considered whether RCW 4.22.070 permits a negligent defendant to be held jointly and severally responsible for damages "caused both by that negligence and the intentional acts of other defendants."[27]

¶21 Plaintiff Tegman had been injured in an accident and hired Richard McClellan and Accident and Medical Investigations, Inc. (AMI) to handle her personal injury claims. Although McClellan held himself out as a licensed attorney, he was not. He employed lawyer Lorinda Noble, who worked on Tegman's case. Noble did not inform Tegman that McClellan was not a lawyer. Nor did she disclose that he was engaged in numerous legal and ethical violations. Ultimately, McClellan settled Tegman's claims without her consent, forged her signature on the settlement check, and deposited the funds in his personal account. Tegman sued McClellan, AMI, Noble, Noble's supervisors, and a paralegal. She alleged a number of negligent and intentional torts. The trial court held all defendants jointly and severally liable for all damages.

¶22 Noble appealed, arguing she should not be liable for the intentional conduct of McClellan and AMI. The Supreme Court agreed, reiterating that joint and several liability under RCW 4.22.070 applies only to damages caused by negligence[28] and that negligent defendants may not apportion liability to intentional tortfeasors: "[N]egligent defendants are jointly and severally liable only for the damages resulting from their negligence. They are not jointly and severally liable for damages caused by inten-

---

[26] *Id.* at 636-37.

[27] 150 Wn.2d at 110 (emphasis omitted).

[28] *Id.* at 115.

tional acts of others."[29] The court remanded for segregation of the damages.[30]

¶23 *Tegman* is about joint and several liability. Here, Metro is the only defendant and negligence is the plaintiffs' only theory. To recover at all, plaintiffs had to prove their injuries were proximately caused by Metro's negligence. There is no issue of joint and several liability in this case.

¶24 Rather, as the trial court observed, this case is akin to *Welch*. The intentional conduct of unknown assailants was a proximate cause of injury in both cases, but no recovery was sought for those injuries. Here and in *Welch*, plaintiffs sought recovery only for damages proximately caused by the *defendant's* negligence. In neither case was there a risk that the negligent defendant would be held liable for the assailants' "share" of the damages, so there was no need for the jury to determine the size of that share or to deduct it from its damages award.

¶25 The jury here was instructed that plaintiffs had to prove that Metro was negligent, that Metro's negligence was a proximate cause of plaintiffs' injury, that there may be more than one proximate cause of an injury, and that its verdict should be for Metro if it found the sole proximate cause of injury was a cause other than Metro's negligence. The court also instructed the jury about calculating damages:

> In calculating a damage award, you must not include any damages that were caused by acts of the unknown assailants and not proximately caused by negligence of the defendant. Any damages caused solely by the unknown assailants and not proximately caused by negligence of defendant King County must be segregated from and not made a part of any damage award against King County.[31]

¶26 Jury instructions are sufficient if they permit each party to argue its theory of the case, are not misleading, and

---

[29] *Id.* at 105.

[30] *Id.* at 119-20.

[31] Clerk's Papers at 155.

properly inform the jury of the applicable law when read as a whole.[32] These instructions accurately stated the law and allowed Metro to argue its theory of the case.

¶27 Metro argues, however, that the jury should have been further instructed that plaintiffs had the burden to establish "the percentage of damages caused by negligent conduct and the percentage of damages caused by the assailants' intentional conduct."[33] Metro relies on an order by federal District Court Judge Ricardo Martinez in *R.K. v. Corp. of Pres. of Church of Jesus Christ of Latter Day Saints.*[34] In that case, the plaintiff alleged the church acted negligently in connection with sexual abuse suffered at the hands of a nonparty intentional tortfeasor. The court ruled the jury must segregate the damages caused by intentional conduct from any damages caused by the church's negligence and submitted a special verdict form instructing the jury first to calculate "the amount of plaintiff's compensatory damages," and then to calculate the percentage of damages attributable to intentional and negligent conduct.[35]

¶28 Another panel of this court recently approved this approach in a similar case. In *Jane Doe v. Corp. of President of Church of Jesus Christ of Latter-Day Saints,*[36] child victims who reported their stepfather's sexual abuse to bishops later sued the church, alleging both negligent and intentional torts in connection to its response to the report. The plaintiffs also sued their stepfather for damages caused by his intentional acts. A jury found the church liable for its

---

[32] *Judd v. Dep't of Labor & Indus.*, 63 Wn. App. 471, 476, 820 P.2d 62 (1991). Here, Metro argued that the unknown assailants were "the real culprits," that the teenagers' intentional conduct was not reasonably foreseeable, and that Metro and its driver were not responsible for damages caused by that conduct.

[33] Clerk's Papers at 103.

[34] *See* Br. of Appellant App. A (Order Granting Def.'s Mot. to Segregate Damages Resulting From Intentional Tortfeasor, No. C04-2338RSM, 2006 WL 2506413 (W.D. Wash. Aug. 28, 2006)).

[35] *See* Br. of Appellant App. B (Special Verdict Form).

[36] 141 Wn. App. 407, 414, 167 P.3d 1193 (2007).

negligent failure to report the abuse, and found both the church and the stepfather liable for intentional infliction of emotional distress.[37] The trial court held the defendants jointly and severally liable. The church appealed, primarily on grounds it had no statutory duty to report the abuse and, consequently, could not be negligent for failing to do so.[38] The church also argued that *Tegman* precluded joint and several liability of a negligent defendant for damages caused by intentional conduct.

¶29 This court agreed the church had no duty to report and reversed the jury verdict based on negligence for failure to report.[39] Because the church was liable only for its intentional conduct, and the only other defendant was the stepfather, there was no longer a negligent defendant to be held jointly and severally liable.[40] Accordingly, *Tegman* no longer had any bearing on the case. The *Jane Doe* court did, however, address *Tegman*'s requirements in dicta.[41] Relevant to this case,[42] the court was persuaded that the federal judge in *R.K.* correctly refused to impose upon the defendant the burden of segregating negligent and intentional damages.[43]

¶30 Neither *R.K.* nor *Jane Doe* concerned joint and several liability of at fault entities. The point of each ruling was to clarify that the negligent defendant has no burden to segregate damages due to negligence from damages due to

---

[37] *Id.*

[38] *Id.* at 425-26.

[39] *Id.* at 428.

[40] *Id.* at 438, 439.

[41] *Id.* at 437-39; *see Ruse v. Dep't of Labor & Indus.*, 138 Wn.2d 1, 8-9, 977 P.2d 570 (1999).

[42] The *Jane Doe* court also included dicta rejecting the argument that *Tegman* does not apply when liability is for negligent failure to protect plaintiff from the intentional conduct of another. *See Jane Doe*, 141 Wn. App. at 438-39. Amicus curiae Washington State Trial Lawyers Association Foundation makes that argument here. Rollins declined to rely on that position in oral argument. In light of our disposition, we need not address the issue.

[43] *Id.* at 440.

the intentional conduct of other defendants. Here, this question does not arise. The trial court plainly required plaintiffs to prove what, if any, damages were proximately caused by Metro's negligence. The court placed no burden of segregation upon the defendant.

¶31 How to instruct on damages will often depend upon the circumstances of the case, which is one reason for the discretion invested in the trial judge.[44] Here, the practical question was how to focus the jury upon the damages caused by the negligent defendant. The instructions accomplished that and properly stated the law. The court did not abuse its discretion.

## Contributory Negligence

¶32 " 'The issue of contributory negligence is generally one for the jury to determine from all the facts and circumstances of the particular case.' "[45] The court should instruct the jury on the issue unless the evidence is "such that all reasonable minds would agree that the plaintiff had exercised the care which a reasonably prudent man would have exercised for his own safety under the circumstances."[46]

¶33 Metro argues an instruction on contributory negligence was justified by the following evidence: Rollins and Hendershott did not alert the driver of their fears about the other passengers, did not move to the front of the bus, did not call for assistance, and did not get off the bus.

¶34 We see no material issue of fact on contributory negligence in this evidence. It is undisputed that Rollins and Hendershott tried to avoid confrontation with the group and that their companion tried to alert the driver to the

---

[44] *Stiley*, 130 Wn.2d at 498 (generally); *Goodman v. Boeing Co.*, 75 Wn. App. 60, 73, 877 P.2d 703 (1994) (damage instructions).

[45] *Bertsch v. Brewer*, 97 Wn.2d 83, 91, 640 P.2d 711 (1982) (quoting *Crisp v. Nursing Homes, Inc.*, 15 Wn. App. 599, 605, 550 P.2d 718 (1976)).

[46] *Id.*

fight in the bus, which generated a violent response from the teens and no apparent reaction from the driver. There is no evidence that Hendershott and Rollins could have moved forward, which would have required making their way through the majority of the intimidating crowd. Nor is there evidence that moving forward would have kept them safe. Finally, even if it would have been reasonable for the teenagers to disembark and walk along Rainier Avenue late at night, Metro fails to explain how that constituted an avenue of escape, for it was when Hendershott and Rollins tried to leave the bus that the assault began in earnest. We agree with the trial court that the evidence leaves no doubt that Rollins and Hendershott acted reasonably under the circumstances. The evidence did not merit an instruction on contributory negligence.

¶35 Affirmed.

SCHINDLER, C.J., and LEACH, J., concur.

Review denied at 166 Wn.2d 1025 (2009).