# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| HBH; SAH; and TREY HAMRICK, litigation guardian ad litem on behalf of KEH, JBH, and KMH, | No.  47438-7-II |
| Appellants, | PART PUBLISHED OPINION |
| v. | |
| STATE OF WASHINGTON, | |
| Respondent, | |
| And | |
| TOWN OF EATONVILLE, | |
| Defendant. | |

BJORGEN, C.J. — KMH, HBH, SAH, KEH, and JBH[1] (collectively, the children) appeal

the trial court's partial dismissal of some of their claims through a CR 50 motion for judgment as

a matter of law, as well as an evidentiary ruling and the final judgment in favor of the

Department of Social and Health Services (DSHS).  Their claims were related to incidents of

---

[1] We use initials to protect the privacy of those who were children at the time of the events.

child abuse by their foster, and later adoptive, parents, Scott and Drew Anne Hamrick (the Hamricks).

The children contend that the trial court erred by (1) dismissing under CR 50 their claims regarding DSHS's failure to investigate during the period before they were adopted, (2) adopting a special verdict form that improperly asked the jury to apportion fault for both intentional torts and negligence, (3) excluding the testimony of two late-disclosed witnesses, and (4) speaking candidly about personal political leanings in court. They also assert that (5) cumulative error violated their rights to a fair trial.

In the published portion of this opinion, we hold that (1) DSHS has a duty of reasonable care to protect children it places in foster homes based on a special relationship and that the plaintiffs produced sufficient evidence to avoid dismissal under CR 50 for claims regarding DSHS's negligence during the period before the children were adopted. In the unpublished portion we hold that (2) the trial court erred by submitting an incorrect special verdict form to the jury, but the error was harmless for those claims; (3) the trial court erred in excluding the two witnesses, but this error also was harmless; (4) the trial court did not create any appearance of unfairness by speaking about political matters; and (5) there was no cumulative error. Accordingly, we reverse the trial court's CR 50 ruling and remand for trial on the claim of negligent failure to investigate and to appropriately protect foster children. We affirm the trial court's judgment as to the remaining claims.

FACTS

1.    Pre-Adoption Period

In February 1998, DSHS placed KMH in foster care with the Hamricks. Social worker Amy Page was assigned to KMH's case and conducted health and safety checks. Page did not receive any information or make any observations suggesting that the Hamricks were abusing KMH or that the placement was otherwise harmful.

In October 1999, twins HBH and SAH were placed with the Hamricks as well. The twins had been in other foster homes for the preceding seven years, and had suffered abuse and neglect in those homes. DSHS social worker Mary Woolridge was assigned to the twins' cases. According to agency policies, Woolridge was supposed to conduct in-home health and safety checks every 90 days at which she was to talk with the girls about their experiences in the home. However, evidence presented at trial indicated that Woolridge may not have conducted these visits as required.

During this period, the Hamricks allegedly abused KMH, HBH, and SAH emotionally and physically, and abused SAH sexually. However, DSHS received no reports of any abuse, and individuals in contact with the children reported that they seemed happy.

In January 2000, DSHS placed KEH and JBH in the Hamricks' home. Social worker Lisa Gilman was assigned to their cases and conducted health and safety visits. Gilman did not receive any indication that abuse was occurring in the Hamrick home. Page later took over as their assigned social worker, and similarly believed KEH and JBH were happy and doing well in the home.

In June 2000, DSHS conducted a home study to determine whether the Hamricks would be suitable adoptive parents. The resulting report recommended that DSHS allow them to adopt all of the children.

2.      Post-Adoption Period

In October 2000, the Hamricks adopted KMH, HBH, and SAH. In January 2003, they adopted KEH and JBH as well.

In April 2008, a school counselor reported suspected physical abuse of SAH. Child Protective Services (CPS) screened this report and decided not to investigate. In November 2009, CPS received a referral related to Scott Hamrick's alleged sexual contact with a juvenile neighbor girl. CPS apparently referred this incident to local law enforcement for criminal investigation but did not investigate the Hamrick household for abuse.

In March 2010, a neighbor reported possible abuse and neglect of KEH to CPS. CPS investigated this report, visiting the Hamrick household and interviewing the children and the Hamricks. Ultimately, CPS determined that the report was unfounded.

In 2011, the Pierce County Sheriff's Department began an investigation of allegations that the Hamricks had abused KMH, HBH, SAH, KEH, and JBH. This investigation led DSHS to remove the children from the Hamrick home. Scott Hamrick committed suicide during the investigation, and Drew Ann Hamrick was charged with crimes related to the abuse.

3.      Claims and Trial

In October 2011, HBH and SAH sued DSHS, claiming that its negligence in failing to investigate or take other protective action allowed the Hamricks to abuse them during their

period as foster, and later adoptive, children in the Hamrick home. A guardian ad litem sued

DSHS on similar grounds on behalf of KMH, KEH, and JBH, who were still juveniles at the

time, and the two cases were consolidated. Following an initial mistrial, the case was tried

beginning in February 2015.

Several days before trial began, the children disclosed two additional witnesses who

would testify concerning matters related to the 2009 CPS referral. The State objected to their

testimony. The trial court excluded the witnesses as a sanction for the children's late disclosure,

believing that the testimony would not add anything significant to the case.

4.    CR 50 Motion

Following the close of both parties' cases, the State moved under CR 50 for judgment as

a matter of law that, inter alia, DSHS was not negligent during the pre-adoption period or in

relation to the 2009 CPS referral. The trial court agreed with the State and granted the motion.

As to the pre-adoption period, it ruled:

> there were so many people involved that were handling this prior to the adoption,
> all of these other voices that were coming in saying, no, there was nothing to show
> there was any abuse. I mean, absent — I mean, does it really matter whether Mary
> Woolridge was or was not doing her health and safety visits[?]. . . . Seems to me
> most of this case comes down to what did they know and when did they know it. .
> . . I can't really see there are any claims based on anything Mary Woolridge did or
> did not do.

Report of Proceedings (RP) (Mar. 5, 2015) at 83. As to the 2009 CPS referral, the court ruled

that "the fact they didn't investigate it is not evidence of any kind of negligence on their part

because they didn't have any duty or obligation to investigate it." RP (Mar. 5, 2015) at 82.

5.    Special Verdict Form

The trial court provided the jury a special verdict form on which it was to document its

verdicts as to negligence and the assignment of any resulting damages. The verdict form first

asked the jury to decide whether DSHS was negligent in its treatment of the 2008 and 2010

referrals and whether its negligence proximately caused harm to the children. It then asked

whether certain other nonparties' negligence proximately caused harm to KMH, HBH, SAH,

KEH, and JBH. In accordance with the trial court's CR 50 rulings, the verdict form included no

questions concerning the pre-adoption period or the 2009 referral.

The verdict form included several questions regarding damages. It asked the jury to

determine "each plaintiff's total amount of damages" as a dollar value. Clerk's Papers (CP) at

638. Next, it stated:

> Assume that 100% represents the total combined negligence or fault that
> proximately caused each plaintiff's damages. What percentage of this 100% is
> attributable to each individual or entity, if any, for whom you answered "yes" in
> answer to [the questions concerning DSHS's and certain nonparties' negligence]?
> For each plaintiff, the percentage of fault must equal 100 %.

CP at 638.

The verdict form next asked, "Were the intentional acts of the following individuals a

proximate cause of any of the plaintiff[s'] damages?" CP at 638. Finally, the form asked:

> What percentage of each plaintiff's damages were caused by . . . all of the
> intentional conduct of [Scott and Drew Ann Hamrick], and what percentage of
> plaintiff[s'] damages were caused by all of the negligent conduct you identified in
> your answers to [the questions concerning negligence]? Your answer for each
> plaintiff must total 100 %.

CP at 639.

6.      Outcome of Trial

The jury found that DSHS was not negligent in its treatment of either the 2008 or 2010

CPS referrals. As a result, it did not calculate or assign any damages to the children on the

special verdict form.

6

The plaintiffs moved for a new trial, arguing that the trial court had erred in its CR 50 ruling, its exclusion of the two witnesses' testimony, and in providing the special verdict form. The trial court denied the motion. The children now appeal.

## ANALYSIS

### I. CR 50 MOTION REGARDING PRE-ADOPTION NEGLIGENCE

The children argue that the trial court erred by dismissing their claims of negligence by DSHS during the pre-adoption period. Underlying this request is the contention that DSHS owes a common law duty of reasonable care to protect children it places in foster homes. We agree. We further hold that the children here established genuine issues of fact as to both breach and causation and, therefore, that the trial court erred in granting the CR 50 motion and in declining to instruct the jury as to DSHS's negligence during the pre-adoption period.

1. Standard of Review

We review de novo a trial court's decision on a motion for judgment as a matter of law on a particular issue under CR 50. *Estate of Bordon ex rel. Anderson v. Dep't of Corr.*, 122 Wn. App. 227, 240, 95 P.3d 764 (2004). Like the trial court, we must determine whether there is any legally sufficient evidentiary basis for a reasonable jury to have found for a party with respect to the issue. CR 50; *Bordon*, 122 Wn. App. at 240. We view all conflicting evidence in the light most favorable to the nonmoving party, here KMH, HBH, SAH, KEH, and JBH. *Bordon*, 122 Wn. App. at 240.

2. Duty to Protect

The children argue that DSHS owes a duty of reasonable care to investigate the health and safety of children it places in foster homes based on a special protective relationship between

the agency and those children.[2]  We agree.

Liability in tort for negligence may lie only where the defendant owes the plaintiff a duty of care.  *Caulfield v. Kitsap County*, 108 Wn. App. 242, 250, 29 P.3d 738 (2001).  "As a general rule, there is no duty to prevent a third party from intentionally harming another unless 'a special relationship exists between the defendant and either the third party or the foreseeable victim of the third party's conduct.'"  *Niece v. Elmview Grp. Home*, 131 Wn.2d 39, 43, 929 P.2d 420 (1997) (quoting *Hutchins v. 1001 Fourth Ave. Assocs.*, 116 Wn.2d 217, 227, 802 P.2d 1360 (1991)); *accord* RESTATEMENT (SECOND) OF TORTS § 315.  Such a special relationship is characterized by either (1) a duty by one party to control the conduct of a third person or (2) a right by one party to the protection of the other.  *Niece*, 131 Wn.2d at 43; *Caulfield*, 108 Wn. App. 253; RESTATEMENT (SECOND) OF TORTS § 315.

"Many special relationships give rise to a duty to prevent harms caused by the intentional or criminal conduct of third parties."  *Niece*, 131 Wn.2d at 44-45.  Common examples include the relationships between schools and their students, innkeepers and their guests, common carriers and their passengers, and hospitals and their patients.  *Niece*, 131 Wn.2d at 44; *Caulfield*, 108 Wn. App. at 255.  These relationships are "'protective in nature, historically involving an

---

[2] The State argues that the trial court correctly dismissed the childrens' negligent investigation claims because DSHS did not breach the duty to investigate imposed by RCW 26.44.050.  The duty to investigate under this statute arises "upon the receipt of a report concerning the possible occurrence of abuse or neglect [by] the law enforcement agency or the [DSHS]."  RCW 26.44.050; *see also Albertson v. State*, 191 Wn. App. 284, 301, 361 P.3d 808 (2015).  The children argued in the trial court that DSHS breached its duty under RCW 26.44.050.  However, on appeal they expressly disclaim any argument based on RCW 26.44.050, contending instead that DSHS's duty to perform health and safety checks was based on a special relationship of entrustment.  Therefore, we need only address the latter source of duty.

affirmative duty to render aid.'" *Caulfield*, 108 Wn. App. at 253 (quoting *Hutchins*, 116 Wn.2d at 228). Our Supreme Court held that the duty to protect another person from the intentional or criminal actions of third parties arises, "where one party is 'entrusted with the well being of another.'" *Niece*, 131 Wn.2d at 50 (quoting *Lauritzen v. Lauritzen*, 74 Wn. App. 432, 440, 874 P. 2d 861 (1994). In finding such a duty, *Niece* also relied on the vulnerability of the person harmed. 131 Wn.2d at 50-51. Similarly, this court in *Caulfield*, 108 Wn. App. at 255, held that these special relationships arise where one party is entrusted with the care of another party rendered vulnerable by the nature of the arrangement.

In finding that a social worker has no duty to protect third persons from the tortious acts of children for whom it coordinates services, Division One of our court noted that social workers are not responsible for day-to-day supervision of such children. *Terrell C. v. Dep't of Soc. & Health Servs.*, 120 Wn. App. 20, 28, 84 P.3d 899 (2004). It explained that "[a]ny 'ongoing' relationship between the social worker and the child is to prevent future harm *to that child*, not to protect members of the community from harm." *Id*. (emphasis added). Our Supreme Court later quoted this language approvingly in *Sheikh v. Choe*, 156 Wn.2d 441, 450, 128 P.3d 574 (2006). However, no Washington court has yet addressed whether such an ongoing relationship between a social worker and a foster child constitutes a special relationship within the meaning of *Restatement (Second) of Torts*, section 315, giving rise to a duty to protect that child from the tortious acts of foster parents. We turn to the *Restatement* and to Washington case law pertaining to foster children to meet that issue.

In defining the contours of a protective special relationship, *Niece* relied on *Restatement (Second) of Torts* § 315, among other sources. 131 Wn.2d at 43. Section 315 states:

> There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless

9

- (a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or
- (b) a special relation exists between the actor and the other which gives to the other a right to protection.

Comment c to this section explains that "[t]he relations between the actor and the other which require the actor to control the conduct of third persons for the protection of the other are stated in §§ 314 A and 320." RESTATEMENT, *supra*, cmt. c. Section 314 A, in turn, lists a number of specific relations of this type, such as common carrier and passenger, none of which involve social worker and foster child. Section 320 deals with custodial relations. Significantly, comment b to *Restatement*, *supra*, section 314A specifies that

[t]he relations listed are not intended to be exclusive, and are not necessarily the only ones in which a duty of affirmative action for the aid or protection of another may be found. . . . The law appears, however, to be working slowly toward a recognition of the duty to aid or protect in any relation of dependence or of mutual dependence.

Thus, we must turn back to our case law to determine the extent to which the State had a duty to protect these plaintiffs.[3]

In *M.W. v. Department of Social & Health Services*, 149 Wn.2d 589, 70 P.3d 954 (2003), the court examined whether RCW 26.44.050 imposes a duty on DSHS to protect children from harm by DSHS workers while investigating potential abuse. *M.W.*, 149 Wn.2d at 597. After examining the statute and the case law interpreting it, the court held that liability under this statute arises only for children

who are harmed because DSHS has gathered incomplete or biased information that results in a harmful placement decision, such as removing a child from a

---

[3] We note that *Restatement (Third) of Torts*, section 40, replaced section 314 A of the *Restatement (Second) of Torts*. However, no party cites to the *Restatement (Third)*, and none argue that the *Restatement (Third)* changed the principles of *Restatement (Second)*, section 315, in a way that affects this appeal.

nonabusive home, placing a child in an abusive home, or letting a child remain in an abusive home.

*Id*. at 602. As noted above, the plaintiffs in this appeal make no claim of liability under RCW 26.44.050. Therefore, the holding in *M.W.* does not govern the resolution of this appeal.[4]

*M.W.* does contain language which, read in isolation, could suggest that all claims of negligence in monitoring the welfare of foster children are limited to this statutory liability. For example, after noting that our courts have not recognized a general tort claim for negligent investigation, the court stated, "The negligent investigation cause of action against DSHS is a narrow exception that is based on, and limited to, the statutory duty and concerns we discuss above." *Id.* at 601. However, the court's entire analysis in *M.W.* was restricted to determining whether liability lay in M.W.'s case under the statute. It examined the wording of the statute, its purpose, and case law interpreting it. Its gaze did not reach the larger question presented here: whether a special relationship is present from which a tort duty to exercise ordinary care would arise. This narrow focus on statutory liability cannot be the basis for a denial of any liability in tort, especially when the cornerstone of that liability, the special protective relationship, was not even discussed. In addition, any duty under the statute is triggered only if a report is received of possible abuse or neglect. To read *M.W.* to deny any liability outside the statute, then, is to restrict liability to situations where a report has been made. Such a narrowing of liability, and its consequent reduction of legal protection of foster children, cannot rest on a doubtful implication from ambiguous language. *M.W.* does not speak to the issue here before us.

---

[4] The Supreme Court cited *M.W.* for its holding in *Roberson v. Perez*, 156 Wn.2d 33, 123 P.3d 844 (2005). *Roberson*, like *M.W.*, is restricted to an interpretation of liability under chapter 26.44 RCW. *Roberson*, 156 Wn.2d at 35, 48.

11

Another central decision in this area is *Braam, ex rel. Braam v. State*, 150 Wn.2d 689, 81 P.3d 851 (2003). The principal issue in *Braam* was whether foster children have a constitutional substantive due process right to be free from unreasonable risks of harm and a right to reasonable safety. *Braam*, 150 Wn.2d at 700. In holding that foster children have this right, the court specified that "the Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process." *Braam*, 150 Wn.2d at 699 (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 849, 118 S. Ct. 1708, 140 L. Ed. 2d 1043 (1998). Thus, *Braam*'s due process analysis and holding does not bear on the issue presented here.

The most direct authority on a common law duty of care is *Caulfield* and *Niece*, both *supra*. In *Caulfield*, we examined whether a special relationship arose when a county contracted with a third party to provide in-home caregiving services to a physically disabled adult as part of a program designed to support disabled people living outside of group nursing facilities. 108 Wn. App. at 255-56. We held that this was a special relationship and that it gave rise to a duty on the part of the county "to protect . . . [such] vulnerable clients from the tortious acts of others, especially when a case manager knows or should know that serious neglect is occurring." *Id*. at 256. We reasoned that because county case workers were responsible under the program for planning and monitoring care, and for terminating the contracted caregiver if care was inadequate, they must use ordinary care to protect their clients from dangers imposed by the caregiver's tortious conduct. *Id*.

The State argues that a special relationship giving rise to tort liability must be custodial in

nature. However, it is clear from *Caulfield* that custody is not a crucial element of such a relationship. There, the contracted caregiver, not the county case worker, had a custodial relationship to the disabled client. 108 Wn. App. at 245-46. The case worker's relationship with the client extended only to planning, monitoring, and providing other support services. *Id*. at 256. The fact that the case worker was entrusted with ensuring the client's wellbeing proved crucial in our assessment of the relationship. *Id*. at 255. *Caulfield* stands for the proposition that entrustment, not custody, is at the heart of a special protective relationship for purposes of imposing a common law tort duty. *Niece*, on the other hand, did involve a custodial relationship between the group home operator and the resident. As noted, however, *Niece* did not base its finding of a special relationship on custody, but rather on the same ground as *Caulfield*, entrustment of a vulnerable individual. *Niece*, 131 Wn.2d at 50; *Caulfield*, 108 Wn. App. at 255. Thus, the decisions of both the Supreme Court and this court signal that custody is not a prerequisite to a protective special relationship.[5]

The relationship between DSHS and children it places in foster homes is quite similar to the one analyzed in *Caulfield*. Just as the county contracted with an in-home caregiver in *Caulfield*, DSHS contracts with licensed foster parents to take in the children. *See DeWater v. State*, 130 Wn.2d 128, 136, 921 P.2d 1059 (1996). Like the county case workers, DSHS social workers are responsible for monitoring the health and safety of the children. *See* former RCW 74.13.031 (1998). Like the county's disabled adult clients, the children are especially vulnerable to harms created by their caregivers. *Aponte v. Dep't of Soc. & Health Servs.*, 92 Wn. App. 604,

---

[5] Alternatively, if some degree of custody were required, it is present. In *Braam*'s discussion of a foster child's substantive due process right to be free from unreasonable risks of harm and a right to reasonable safety, the Supreme Court characterized the State as "custodian and caretaker of foster children." 150 Wn.2d at 700. This custodial relation is not somehow effaced when the inquiry shifts from substantive due process to a special relationship.

622, 965 P.2d 626 (1998). The facts and policies at work in this appeal parallel those in *Caulfield*. As in *Caulfield*, they lead to the presence of a special relationship.

Perhaps more to the point, *Niece* found a special relationship "where one party is 'entrusted with the well being of another,'" and the entrusted party is vulnerable to a degree. 131 Wn.2d at 50 (quoting *Lauritzen*, 74 Wn. App. at 440). As noted, *Niece* did not rely on custody in finding this relationship. Absent proper monitoring by the State, a foster child is wholly exposed to the will of the foster parents, whether that will is a blessing or a horror. In this setting, the State is the last watchman of the foster child's well being. A more compelling illustration of the bases of a special relationship established in *Niece* is hard to imagine.

For these reasons, we hold that DSHS owed the children a duty like that recognized in *Caulfield* to take ordinary care to protect them from the tortious or criminal conduct of their foster parents. The trial court erred to the extent it ruled that no such duty exists.

3.      Breach of Duty

DSHS policies require case workers to conduct health and safety checks for foster children. Evidence presented at trial showed that such visits were supposed to occur every 90 days during the first year children are in a new foster home. The evidence, however, indicated that Woolridge did not conduct such health and safety checks for SAH during the pre-adoption period.

DSHS's failure to conduct required health and safety checks—either at all or with sufficient regularity—constituted sufficient evidence of a breach of its duty of care to avoid dismissal under CR 50. Accordingly, the trial court erred to the extent it ruled that there was an

insufficient evidentiary basis for a reasonable jury to find that DSHS breached its duty to protect the children.[6]

4.      Causation

The State argues that even if DSHS had a duty to perform health and safety checks, the children did not produce evidence from which the jury could find that a breach of that duty caused their injuries. We disagree.

To prove negligence, a plaintiff must establish that the negligent party's action or failure to act was the proximate cause of the plaintiff's harm. *Wuthrich v. King County*, 185 Wn.2d 19, 25, 366 P.3d 926 (2016). Proximate cause consists of two elements: cause in fact and legal causation. *Tyner v. Dep't of Soc. & Health Servs.*, 141 Wn.2d 68, 82, 1 P.3d 1148 (2000). Cause in fact requires a determination that if the defendant did not breach the duty of care, the plaintiff's injuries would not have occurred. *See id*. Legal causation describes the policy-based determination that the defendant's breach of the duty of care was of sufficient causal proximity to support imposition of liability for the resulting injuries. *See id*.

To establish cause in fact, a negligence plaintiff must prove that but for the defendant's breach of duty, the plaintiff would not have been injured. *Id*. This is a factual question, but may be resolved as a matter of law where a reasonable jury could reach only one conclusion based on the evidence presented. *Hungerford v. Dep't of Corr.*, 135 Wn. App. 240, 251, 139 P.3d 1131 (2006). Mere speculation or argumentative assertions of possible counterfactual events is insufficient to prove that but for the defendant's breach of duty the plaintiff would not have been injured. *Id*. at 252, 254.

---

[6] We do not suggest that compliance with DSHS policies is necessarily enough to ensure compliance with the duty to exercise ordinary care to protect foster children.

The children claim that if DSHS had properly conducted health and safety checks, they would have given the social worker some indication of abuse. SAH testified at trial that

> *if I felt safe* and knew—and the woman was always there, *if I felt safe*, I believe I would have said something. I was a very outspoken young girl.

RP (Feb. 11, 2015) at 32 (emphasis added). The record also shows that SAH wanted someone to give her the opportunity to tell what was happening to her and that she asked to talk privately with a therapist. The jury reasonably could have found based on this evidence that had the social worker properly performed health and safety checks, SAH or the other girls would likely have felt safe enough with the social worker to disclose the abuse or that the checks would have otherwise uncovered or given DSHS reason to suspect abuse during the pre-adoption period.

In addition, records of SAH's and HBH's visits with a therapist showed that the girls were "sexually acting out together and using language which you wouldn't expect a child to use." RP (Feb. 9, 2015) at 48. The children's standard of care expert testified if Woolridge had been aware of this behavior, it would have been reason to increase the health and safety checks by DSHS. The jury could reasonably have found based on this evidence that the social worker would likely have encountered similar behaviors had she properly performed health and safety checks and that such encounters would have triggered an investigation. Notably, the jury would have considered all of this evidence in light of the testimony of the children's standard of care expert that proper health and safety checks in general help built rapport, encourage honest communication, and provide an avenue for disclosure of abuse and for observation of various indicators of abuse.

This evidence supplies a sufficient basis for a reasonable jury to find that but for the allegedly deficient health and safety checks, SAH or one of the other girls would have disclosed the abuse and the State would have intervened. It also provides a sufficient basis for a finding of

16

legal causation. With this, there was a sufficient evidentiary basis for a reasonable jury to find that DSHS's breach of its duty to protect the children was a proximate cause of their injuries. Therefore, the trial court erred in entering judgment as a matter of law under CR 50 on the children's claims regarding the pre-adoption period.

CONCLUSION

We hold that DSHS has a duty to exercise ordinary care to protect foster children on the basis of its special relationship with such children. We hold also that the evidence, viewed in the light most favorable to KMH, HBH, SAH, KEH, and JBH, supplied a legally sufficient evidentiary basis for a reasonable jury to find by a preponderance that DSHS breached that duty during the pre-adoption period and proximately caused at least some of the children's damages. Consequently, we reverse the trial court's CR 50 ruling and remand for trial on the claims of negligent investigation and failure to take appropriate protective action during the period before adoption.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record in accordance with RCW 2.06.040, it is so ordered.

II. SPECIAL VERDICT FORM

The children argue that the trial court erred by providing a special verdict form that asked the jury to segregate damages in an improper way. We agree, but hold that the error was harmless.

We review errors of law in jury instructions de novo. *Hue v. Farmboy Spray Co.*, 127 Wn.2d 67, 92, 896 P.2d 682 (1995). A trial court's instructions to the jury are legally sufficient if they properly inform the jury of the applicable law, are not misleading, and permit each party

to argue its theory of the case as to any matters the jury will decide. *Boyd v. Dep't of Soc. & Health Servs.*, 187 Wn. App. 1, 11, 349 P.3d 864 (2015). However, even where the trial court erred in instructing the jury, we reverse only if the error prejudiced a party below. *Hue*, 127 Wn.2d at 92.

Jury instruction 19 required the jury to determine what percentage of total negligence was attributable to the negligence of DSHS and what percentage was attributable to the negligence of the Hamricks, and stated that the total must equal 100 percent. Further, in calculating any damage award, the jury was instructed to segregate any damages caused by such negligence from damages caused solely by the Hamricks' *intentional* acts. Instruction 21 stated:

> In calculating any damage award, you must not include any damages that were caused by the intentional acts of Drew Anne Hamrick and/or Scott Hamrick and not proximately caused by negligence of State of Washington/DSHS, nonparty Trey Hamrick, and/or nonparty Kelly Hamrick. Any damages caused solely by the intentional acts of Drew Ann Hamrick and/or Scott Hamrick and not proximately caused by negligence of State of Washington/DSHS, Trey Hamrick and/or Kelly Hamrick must be segregated from and not made part of any damage award against State of Washington/DSHS.

CP at 632. The children agree that instructions 19 and 21 correctly state the law.

Questions 1 through 5 of the trial court's verdict form involved whether DSHS was negligent and question 6 involved whether the Hamricks were negligent. Question 7 then asked the jury to find the amount of each child's damages. Based on instruction 21, the jury was not allowed to include in this amount any damages caused solely by the Hamricks' intentional acts. Consistent with instruction 19, question 8 required the jury to determine what percentage of total negligence was attributable to the negligence of DSHS and what percentage was attributable to the negligence of the Hamricks, and stated that the total must equal 100 percent. Again, the Plaintiffs do not object to this series of instructions.

Next, question 9 asked the jury to determine whether the Hamricks' intentional acts were a proximate cause of *any* of the children's damages. Question 10 then asked the jury:

> What percentage of each plaintiff[s'] damages were caused by . . . all of the intentional conduct of [Scott and Drew Ann Hamrick], . . . and what percentage of plaintiff[s'] damages were caused by all of the negligent conduct you identified in your answers to Question No. 7? Your answer for each plaintiff must total 100%.

CP at 639. Question 10 also asked the jury to allocate percentages to either "[d]amages from intentional conduct" or "[d]amages from negligent conduct," with the total equaling 100 percent. CP at 640.

The children argue that including question 10 in the verdict form misled the jury as to the segregation of damages by indicating that it could allocate some of the negligence damages already segregated under instruction 21 to the Hamricks' intentional torts. We agree.

We read jury instructions as a whole when determining sufficiency. *Rollins v. King County Metro Transit*, 148 Wn. App. 370, 379-80, 199 P.3d 499 (2009). We believe that here the instructions read as a whole were misleading. Instruction 21 correctly required the jury to segregate the damages caused by DSHS's negligence from the damages "caused *solely* by the [Hamricks'] intentional acts." CP at 632 (emphasis added). This instruction directed the jury response to question 7 of the verdict form, requiring the jury to exclude damages caused solely by the Hamricks' intentional acts in determining the amount of the children's damages. But question 10 then allowed for a second segregation of those *negligence-related* damages between damages "caused by all of the negligent conduct" and those "caused by . . . all of the [Hamricks'] intentional conduct." CP at 638-40.

The State argues that question 10 simply presented a step-by-step method of implementing instruction 21. Read in the context of instruction 21, however, question 10 created

19

a significant risk that the jury would segregate damages twice. We hold that the jury instructions and verdict form questions as a whole were misleading as to the segregation of damages.[7]

However, KMH, HBH, SAH, KEH, and JBH have shown no resulting prejudice. An erroneous jury instruction is prejudicial if it affects the outcome of the trial. *RWR Mgmt., Inc. v. Citizens Realty Co.*, 133 Wn. App. 265, 278, 135 P.3d 955 (2006). We will not presume prejudice if an instruction was misleading but did not misstate the law. *Paetsch v. Spokane Dermatology Clinic, P.S.*, 182 Wn.2d 842, 849, 348 P.3d 389 (2015). Here, because the jury found that DSHS was not negligent, it assigned no damages at all. It could not have been misled by the damage assignment portion of the special verdict form because it did not reach that portion of the form. Any error in that unused portion of the form had no effect on the outcome of the case.

Accordingly, we hold that the trial court committed no reversible error regarding the claims that went to the jury in issuing the special verdict form. However, on remand the trial court's verdict form should be consistent with our analysis above.

### III. EXCLUSION OF WITNESS TESTIMONY

The children argue that the trial court erred by excluding the testimony of two late-disclosed witnesses without performing the analysis required by *Jones v. City of Seattle*, 179 Wn.2d 322, 314 P.3d 380 (2013). We agree that the trial court erred but hold that the error was harmless.

---

[7] Question 9 also is inconsistent with instruction 21. Instruction 21 requires segregation of damages caused *solely* by the Hamricks' intentional conduct and damages caused by DSHS's negligence. Question 9 asked the jury to determine whether the Hamricks' intentional acts were *a* proximate cause of any of the children's damages. Under instruction 21, the jury should have been asked whether the Hamricks' intentional acts were the *sole* proximate cause of any of the children's damages

We review a trial court's decision to exclude witness testimony for an abuse of discretion. *Id.* at 337. A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or reasons. *Peralta v. State*, 191 Wn. App. 931, 951, 366 P.3d 45 (2015), *review granted in part*, 185 Wn.2d 1027 (2016). The erroneous exclusion of witnesses without performing the analysis required by *Jones* and *Burnet v. Spokane Ambulance*, 131 Wn.2d 484, 933 P.2d 1036 (1997), has been held to be subject to harmless error analysis. *Jones*, 179 Wn.2d at 338. An error is harmless, and therefore not grounds for reversal, if it does not affect the outcome of the case. *Blaney v. International Association of Machinists and Aerospace Workers, Dist. No. 160*, 151 Wn.2d 203, 211, 87 P.3d 757 (2004).

Under *Jones*, a trial court may not exclude late-disclosed witnesses as a sanction without first "explicitly consider[ing] whether a lesser sanction would probably suffice, whether the violation at issue was willful or deliberate, and whether the violation substantially prejudiced the opponent's ability to prepare for trial." *Id.* at 338; *see also Burnet*, 131 Wn.2d at 484. The trial court need not invoke *Jones* or *Burnet* specifically, but the record must show that the trial court evaluated the necessary elements before excluding the testimony. *Jones*, 179 Wn.2d at 344.

Here, the trial court did not conduct the evaluation required by *Jones* and *Burnet.* In ruling to exclude the testimony, the court reasoned as follows:

> [I]f you were intending on calling them as witnesses, they could have been disclosed at least a month ago; so I'm not going to allow them to testify at this time. I don't think that their testimony is going to add materially to anything. We already know the subject of the 2009 referral, and I would assume at some point we're going to have a caseworker that's going to be testifying about that referral and why they did or did not do anything. All right? So I don't think we need either [of the witnesses] to add anything to that; so at this point, I'm not going to allow [them], as lay witnesses, to testify.

RP (Feb. 5, 2015) at 26. This ruling did not address whether a lesser sanction would suffice, whether the late disclosure was willful or deliberate, or whether the late disclosure prejudiced the State in its trial preparation. Therefore, the trial court erred under *Jones*.

However, the children have made no showing—in fact, they do not even argue—that the exclusion prejudiced them. The record shows that the witnesses would have testified to matters related to a 2009 referral to CPS. The evidence presented at trial showed that that particular referral did not result in any mandate for DSHS to investigate. Consequently, the trial court dismissed all claims based on DSHS's inaction in light of that referral, and the children have not appealed that dismissal. Given the dismissal and the absence of a showing of prejudice from excluding the witnesses, we hold that the trial court's failure to follow *Jones* did not prejudice KMH, HBH, SAH, KEH, or JBH and constituted harmless error.

## IV. COMMENTS REGARDING PERSONAL POLITICAL LEANINGS

The children argue that the trial court violated their rights to a trial presided over by a fair and impartial judge when it discussed matters of personal political preference. We disagree.

The children base their argument on the appearance of fairness doctrine. Under that doctrine, they must show actual or perceived bias to establish a violation of their right to a fair trial. *GMAC v. Everett Chevrolet, Inc.*, 179 Wn. App. 126, 154, 317 P.3d 1074, *review denied*, 181 Wn.2d 1008 (2014). The critical question is whether the proceedings would have appeared unfair to a reasonably prudent and disinterested person. *Id.* We review appearance of fairness claims de novo. *In re Disciplinary Proceeding Against King*, 168 Wn.2d 888, 899, 232 P.3d 1095 (2010).

According to SAH's declaration in support of the children's motion for a new trial, the presiding judge discussed the lifelong trajectory of her political views and described political

disagreements with another judge. Yet the record shows no nexus between these comments and the parties or the issues to be decided in the case. It is unclear how commentary regarding political matters would have produced any actual or potential bias in a negligence case related to the abuse of foster children. No reasonably prudent, disinterested person would infer from these comments by the trial court that it was biased as to the issues before it.

The children also argued in the superior court that "it is clear that members of the jury likely over[]heard the Court's comments and was [*sic*] likely influenced by it in some unknown, but prejudicial, way." CP at 676. They speculated that jurors may have decided the case according to their own political biases rather than the evidence presented in the case and the instructions of the court as to the applicable law. However, the jury was properly instructed to find the facts of the case based only on the evidence presented, and we presume that the jurors followed those instructions. *Peralta*, 191 Wn. App. at 950.

Speculation as to jurors' motivations does not rebut this presumption and is no substitute for a showing of actual or potential bias. The children have not shown that the trial court's comments produced any actual or perceived bias on the part of any jurors.

## V. CUMULATIVE ERROR

The children also argue that the cumulative effects of the preceding claimed errors in aggregate violated their right to a fair trial. We disagree.

The children cite no authority for applying the cumulative error doctrine in a civil case. In criminal cases our courts have held that cumulative error may warrant reversal even where the trial court's individual errors were harmless. *In re Pers. Restraint of Cross*, 180 Wn.2d 664, 690, 327 P.3d 660 (2014). This is the case "when there have been several trial errors that standing alone may not be sufficient to justify reversal but when combined may deny a defendant a fair

23

trial." *State v. Greiff*, 141 Wn.2d 910, 929, 10 P.3d 390 (2000). "The test to determine whether cumulative errors require reversal of a defendant's conviction is whether the totality of circumstances substantially prejudiced the defendant and denied him a fair trial." *Cross*, 180 Wn.2d at 690.

Assuming that the doctrine applies in civil cases, the children have not shown cumulative error warranting reversal. The trial court erred in instructing the jury as to the segregation of damages and in excluding two witnesses as a sanction for the children's late disclosure of those witnesses. However, there is no clear cumulative impact from those errors. The children argue that "key rulings were decided on the fly without any serious consideration as to the controlling law and/or admitted evidence." Br. of Appellant at 33-34. This addresses a commonality of causation—and a highly abstracted one—but does not speak to the cumulative effects of those errors. [8]

The children have not shown that cumulative error denied them a fair trial.

## CONCLUSION

We hold that DSHS has a duty to exercise ordinary care to protect foster children on the basis of its special relationship with such children. We hold also that the evidence, viewed in the light most favorable to the children, supplied a legally sufficient evidentiary basis for a reasonable jury to find by a preponderance that DSHS breached that duty during the pre-adoption period and proximately caused at least some of the children's damages. Consequently, we

---

[8] The children seem to argue that they suffered generalized prejudice because the trial court's CR 50 rulings forced them to give a closing argument that did not mirror their opening statement, harming their attorneys' credibility in the eyes of the jury. However, a change in legal argument is an ineluctable result of granting a CR 50 motion on some but not all claims. In addition, the jury was properly instructed to base its verdict only on the evidence presented and the instructions of the court. We presume that the jurors followed those instructions, *Peralta*, 191 Wn. App. at 950, and nothing in the record or briefing shows that they did not.

reverse the trial court's CR 50 ruling and remand for trial on the claims of negligent investigation and failure to take appropriate protective action during the period before adoption. However, we disagree with the children's other arguments and affirm the trial court's judgment as to the 2008 and 2010 CPS referrals.

Bjorgen, C.J.
BJORGEN, C.J.

We concur:

Johanson, J.
JOHANSON, J.

Maxa, J.
MAXA, J.